923 F.2d 1474
 55 Fair Empl.Prac.Cas. 211,
55 Empl. Prac. Dec. P 40,562
Mathas BROWN, Plaintiff-Appellant,
v.
CITY OF FORT LAUDERDALE, a municipality, and Constance W.
Hoffman, in her official capacity as City Manager
of the City of Fort Lauderdale,
Defendants-Appellees.
Ron Cochran, in his official capacity as Police Chief of the
City of Fort Lauderdale, Police Department, Defendant.
Mathas BROWN, Plaintiff-Appellant,
v.
CITY OF FORT LAUDERDALE, a municipality, Constance W.
Hoffman, in her official capacity as City Manager of the
City of Fort Lauderdale, and Ron Cochran, in his official
capacity as former Police Chief of the City of Fort
Lauderdale Police Department, Defendants-Appellees.
 Nos. 89-5839, 89-6272.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 19, 1991.
 
 Mathas Brown, Fort Lauderdale, Fla., for plaintiff-appellant.
 Lindsey A. Payne, Asst. City Atty., Fort Lauderdale, Fla., for defendants-appellees.
 Appeals from the United States District Court for the Southern District of Florida.
 Before CLARK, Circuit Judge, HILL*, and COFFIN**, Senior Circuit Judges.
 COFFIN, Senior Circuit Judge:
 
 
 1
 Appellant Mathas Brown brought this lawsuit pro se under 42 U.S.C. Secs. 1981 and 1983 claiming that he was fired from his job as a police officer for the City of Fort Lauderdale because he is black. He sued the City, the police chief and the city manager under each statute, but the district court in two separate orders dismissed all of his claims. The court held that qualified immunity protected the individual defendants from liability under Sec. 1983 and that, after Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), a racially motivated discharge is not actionable under Sec. 1981. The court further held that the complaint failed to allege a city policy of discrimination against blacks.
 
 I. Background
 
 2
 In reviewing the district court's decision to end this case at the pleading stage, we must give all possible breadth to the plaintiff's articulation of his claims. We take the material allegations of the complaint as true, and we construe those allegations liberally in favor of the plaintiff. Fundiller v. City of Cooper City, 777 F.2d 1436, 1439 (11th Cir.1985). This standard requires us to reverse the dismissal " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).
 
 
 3
 We have concluded that Brown's allegations, when viewed in this benevolent light, are sufficient to withstand defendants' motions to dismiss.[1] Before discussing in detail the specific claims, we shall summarize both the circumstances surrounding Brown's termination and the district court's rationale for dismissing all claims.
 
 A. Facts
 
 4
 We draw the following statement of facts from plaintiff's voluminous 31-page complaint and the exhaustive set of documents attached to it as exhibits.
 
 
 5
 On June 19, 1986, approximately five and one-half years after plaintiff Brown joined the Fort Lauderdale Police Force, Chief Ron Cochran notified him by letter that he was being dismissed "because of deficiencies in performance and/or conduct."[2] The letter specifically referred to a series of Employee Performance Rating Reports which, beginning in December 1981, rated Brown as "overall satisfactory" until a November 1985 report rated him as "marginal" with less-than-satisfactory ratings in twelve of sixteen categories.[3] Specific deficiencies noted were quality of work, attendance and self-expression. The letter stated that a follow-up review of Brown's performance, conducted 90 days after the November 1985 evaluation, similarly led to an unsatisfactory rating. In addition, the chief referred to Brown's erratic attendance at a required Report Improvement Course in May 1986 and a disciplinary record containing two written reprimands and a counseling form.
 
 
 6
 On July 3, Brown received a letter from City Manager Constance Hoffman, the official who technically had the authority to hire and fire all city employees. She confirmed Brown's dismissal, stating that "I have reviewed the circumstances surrounding this matter and I concur with Chief Cochran's decision."
 
 
 7
 Brown challenges the validity of many of the reasons given by the chief for his discharge. First, he claims that the November 1985 performance report rating him as unsatisfactory was completed by an officer who had supervised his work for less than two months and was prejudiced against blacks, and, more importantly, that the 90-day follow-up evaluation never occurred.[4] Second, he claims that the quality of his work was unfairly criticized. On the issue of "self-expression," for example, Brown submitted as an exhibit to his complaint a memorandum from the coordinator of a writing program he had been required to attend in 1984. The coordinator reported that Brown had written a short, one-page report "which really did not indicate any particular trouble areas." In addition, she noted that Brown "has been most cordial and cooperative, and is very willing to try to improve himself."
 
 
 8
 Third, Brown claims the chief unfairly implied that he has unsatisfactory work habits by referring to his poor attendance at the improvement course. When first notified about the course, Brown had requested that he be allowed to attend a later session for health reasons. Brown explained in a letter to Cochran, which was attached to the complaint, that he was in the midst of an intensive exercise program as treatment for a back injury suffered in an on-the-job car accident, and wished to devote as much time as possible to that program until the date of his next doctor's appointment in two months. The chief denied the request for a delay without explanation. In his complaint, Brown states that he missed ten of the twenty-four class hours because of "doctor appointments, physical therapy appointments, and periodic excruciating pain" in his back.
 
 
 9
 Moreover, Brown claims that white police officers regularly are allowed to miss work for the treatment of injuries, and he listed in his complaint the names of seven officers, including one who allegedly left the scene of an accident in which he was involved. That officer is still employed by the department.
 
 
 10
 Fourth, Brown attributes his disciplinary notices largely to the widespread racial prejudice he believes exists within the police department. For example, a counseling slip was placed in his record following an incident in which both he and another officer responded to a domestic disturbance. In a written statement submitted to the police department following the incident, Brown reported that, consistent with usual practice, he had asked the other officer, Mastrangelo, to handle the call once Brown discovered that he knew the couple involved. Brown's statement reports that he remained with Mastrangelo as back-up until the dispute was resolved, and that he had checked for a weapon before Mastrangelo arrived on the scene. Mastrangelo's statement, however, indicates that Brown had not checked for a weapon, despite reports that the husband was armed, and that Brown had left him unprotected, staying far to the rear while Mastrangelo handled the incident. Brown alleges that his sergeant placed a counseling form concerning this incident in his file, but not in Mastrangelo's, and that Mastrangelo's version of the incident was accepted simply because he is white.
 
 
 11
 Brown claims that several other incidents also led unfairly to blemishes on his record. He once received a written reprimand for leaving his shift early, a customary practice, but a white officer who signed off duty just ahead of him on the same day was not similarly criticized. On another occasion, an internal investigation into a suspect's complaint that Brown mishandled the suspect's property resulted in a finding in favor of Brown, but a counseling form stemming from the incident nevertheless was placed in his file. Yet another time Brown received a counseling slip as a result of an incident in which Officer Mastrangelo asked him to enter a bar "to see if anyone would call [him] a Nigger." Brown refused and left the scene. He reported the incident to supervisors, who took no action against Mastrangelo. Brown, however, was censored in his annual performance rating report for "publicly enter[ing] into a verbal altercation with another Officer regarding a request."
 
 
 12
 In sum, Brown claims that the reasons given for his termination were without merit, and that racial discrimination provided the real basis for his discharge.[5]
 
 B. The District Court's Opinions
 
 13
 The district court dismissed the City of Fort Lauderdale from the case on the ground that Brown failed to allege a citywide policy or custom of discrimination, a necessary element of a civil rights claim against a municipality. See Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978). The court dismissed the Sec. 1983 claims against both Cochran and Hoffman based on qualified immunity. It stated merely that the defendants were entitled to immunity because Brown had failed to allege facts demonstrating that the constitutional right allegedly infringed was clearly established at the time of their conduct or that the defendants knew or should have known that their conduct violated a constitutional norm.
 
 
 14
 The court dismissed the Sec. 1981 claim against Hoffman without explanation, but initially held that Brown's claim against the chief under Sec. 1981 was sufficiently developed to withstand a motion to dismiss. In rejecting dismissal on this claim, the court stated:Plaintiff has made allegations of discriminatory acts by various police officers and supervisory personnel who disciplined plaintiff because he was black, whereas white police officers were not disciplined for the same actions. Specifically, plaintiff has alleged five incidents where he was reprimanded or given negative evaluations because he was black where white officers were not reprimanded or given negative evaluations for the same behavior. These reprimands and evaluations ultimately led to plaintiff's dismissal by Chief Cochran. Plaintiff further submits that Chief Cochran was aware of these discriminatory practices and allowed them to persist. Plaintiff's allegations present an issue as to whether the plaintiff was dismissed for poor work quality, poor self expression, poor attendance and poor technical efficiency, as stated in his letter of dismissal, or whether intentional discrimination with racial animus existed.
 
 
 15
 About 18 months later, however, the court also dismissed this sole remaining claim. It held that, under the Supreme Court's recent decision in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), a claim for discriminatory discharge is no longer actionable under Sec. 1981. The court granted Brown leave to file an amended complaint asserting a claim for relief under Title VII.
 
 
 16
 Brown appealed both orders dismissing his claims.
 
 II. Section 1983 Claims
 
 17
 A. The chief of police (Cochran) and the city manager (Hoffman)
 
 
 18
 The district court did not reach the merits of Brown's Sec. 1983 claims against Cochran and Hoffman because it found that both are entitled to qualified immunity from liability.[6] Government officials may be shielded from liability for damages in a Sec. 1983 action if, at the time they acted, the statutory or constitutional right allegedly violated was not "clearly established." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The contours of the right must be sufficiently clear that a reasonable official would understand that what he or she did violated that right. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 19
 It is beyond doubt that the principal right allegedly violated by the defendants--the equal protection right to be free from intentional racial discrimination--was clearly established at the time Cochran and Hoffman fired Brown. See, e.g., Washington v. Davis, 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).[7] If the defendants terminated Brown based on a poor performance record that they knew was compiled unfairly because of his race, or that would not have resulted in the discharge of a white officer they unquestionably would not be immune from civil liability.[8] At this stage of the proceedings, we cannot say as a matter of law that Brown has failed to show such racial discrimination.
 
 
 20
 The complaint lists numerous specific instances of allegedly discriminatory conduct that Brown claims led to the decision to terminate him. Indeed, the district court originally refused to dismiss the Sec. 1981 claim against Cochran because Brown's allegations "presented an issue" whether the discharge was based on racial discrimination rather than poor performance. The complaint and documents attached to it, many of which presumably came from his personnel file, permit the inference that Cochran had knowledge of the racial implications of the various incidents cited by Brown, and also acted with racial animus himself. We note in particular Brown's report on the incident in which Mastrangelo directed him to enter a bar for the asserted purpose of eliciting racial epithets, and the resulting counseling slip reprimanding Brown. In addition, an obvious conflict existed between departmental ratings citing him for poor expression and the writing instructor's report that she found no particular problems in his work. Also significant is the chief's refusal, without explanation, to permit Brown to delay attendance at the improvement course, and the allegation that white officers routinely are excused from work for medical reasons.
 
 
 21
 Another document that presumably would have been brought to the chief's attention is a March 5, 1986 letter, written on Brown's behalf by an attorney, and addressed to the president of the police union. The letter alleged racial motivation for Brown's recent poor performance ratings as well as "a consistent pattern in practice of prejudicial conduct towards him over the past several years." This letter further supports the inference that Cochran knew that Brown's poor performance record was affected by racial animus, and that the decision to terminate him was an intentional act of unconstitutional discrimination. We therefore conclude that Brown's complaint, as the district court recognized, alleges sufficient facts to foreclose a finding of immunity for Cochran at this juncture.
 
 
 22
 The allegations concerning what city manager Hoffman knew or should have known about the discriminatory treatment of Brown by the police department are, though expressed in very few words, sufficient to withstand a motion to dismiss. In the words of the city manager herself, in her letter of July 3, she had "reviewed the circumstances surrounding this matter." While this language might be read as meaning only that she had read and concurred with the reasons outlined in Chief Cochran's letter of dismissal (and that her role was simply as a rubber stamp), it can also be read without any strain to indicate that she had looked into Brown's file and was aware of the data and documents we have described that point to discriminatory acts. If indeed she had such knowledge of a discrimination-riddled department when she dismissed Brown, she might well be found to have acted unconstitutionally. Whether or not such reading can be eventually supported by evidence, the averment survives dismissal at the pleading stage.
 
 
 23
 Accordingly, we reverse the district court's dismissal of the Sec. 1983 claims against both Cochran and Hoffman, and remand those claims to the district court for further proceedings.
 
 B. The City of Fort Lauderdale
 
 24
 It is well established that a municipality may be held liable under Sec. 1983 only when the deprivation at issue was undertaken pursuant to city "custom" or "policy," and not simply on the basis of respondeat superior. See St. Louis v. Praprotnik, 485 U.S. 112, 125 n. 2, 108 S.Ct. 915, 925 n. 2, 99 L.Ed.2d 107 (1988); Pembaur v. Cincinnati, 475 U.S. 469, 478-80, 106 S.Ct. 1292, 1297-98, 89 L.Ed.2d 452 (1986); Monell, 436 U.S. at 694, 98 S.Ct. at 2037; Mandel v. Doe, 888 F.2d 783, 791 (11th Cir.1989). Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'--that is, acts which the municipality has officially sanctioned or ordered." Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298, quoted in Mandel, 888 F.2d at 791. See also Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) (liability must be based on something more than a theory of respondeat superior) (citing cases).
 
 
 25
 A "municipal act" is not, however, limited to decisions made by the city's official legislative body or in written agreements. City policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom. See Mandel, 888 F.2d at 791. In dismissing the claims against the city, the district court mistakenly understood Brown's complaint, at paragraph 14, to have admitted that the police department's employment policies were "fair and just" when the paragraph acknowledged only that there was no formal, written policy of discrimination. Paragraph 14, in fact, alleged that those empowered to carry out the facially equitable written policies did discriminate.
 
 
 26
 Thus, while the complaint explicitly negates a claim of municipal liability based on formally adopted municipal policies, we believe it does, in paragraph 14 and elsewhere, adequately allege facts that would permit the city to be held responsible for Brown's termination under either the policymaker or custom approaches to municipal liability.
 
 
 27
 (1) Final Policymaker. We note preliminarily that neither the pro se plaintiff nor the presumably experienced city counsel has briefed the individual policymaker route to municipal liability, which has been the subject of two recent decisions by the Supreme Court.[9] See Praprotnik, 485 U.S. at 123, 108 S.Ct. at 923; Pembaur, 475 U.S. at 481, 106 S.Ct. at 1299. In those cases, the Court explored the scope of this theory of liability and concluded that a city is responsible for any actions taken by the particular official who "possesses final authority to establish municipal policy with respect to the action ordered," Pembaur, 475 U.S. at 481, 106 S.Ct. at 1299. In other words, a municipal official who has "final policymaking authority" in a certain area of the city's business may by his or her action subject the government to Sec. 1983 liability when the challenged action falls within that authority.
 
 
 28
 Whether a particular official has final policymaking authority is a question of state law, Jett v. Dallas Indep. School Dist., 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); Praprotnik, 485 U.S. at 124, 108 S.Ct. at 924; Free v. Granger, 887 F.2d 1552, 1557 (11th Cir.1989). In this case, therefore, if the individual defendants were found to have violated Brown's rights by firing him, the City of Fort Lauderdale could be held liable if state law assigns to them the final authority to make personnel decisions for the police department.
 
 
 29
 The record at this point suggests that at least Hoffman, and perhaps Cochran as well, wields the relevant authority. Defense counsel in oral argument and documents submitted by plaintiff indicate that the city manager is the ultimate decisionmaker on police department personnel matters, and counsel suggested at argument that the police chief also is a policymaker with respect to the department's hirings and firings. Our task, however, is not to determine who, in fact, wields final policymaking authority but only to consider whether plaintiff has alleged sufficient facts to withstand the city's motion to dismiss. Without question, plaintiff's allegations against the police chief and city manager leave open the possibility of city liability based on the actions of a policymaker. The district court on remand will need to consider all available evidence of policymaking authority before deciding the issue of municipal liability. See Mandel, 888 F.2d at 793 ("[T]he court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law.").[10]
 
 
 30
 (2) Municipal Custom. To prove Sec. 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law," Praprotnik, 485 U.S. at 127, 108 S.Ct. at 926 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S.Ct. 1598, 1613-14, 26 L.Ed.2d 142 (1970)). In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.
 
 
 31
 We disagree with the district court's conclusion that Brown's complaint lacks sufficient allegations of a custom of racial discrimination. Brown repeatedly alleged that his experiences were the result of discriminatory practices accepted by the police department. See pp 10, 13, 15, 19, 22. Indeed, in its discussion of the Sec. 1981 claim against Cochran, the district court referred to the series of discriminatory practices alleged by plaintiff and to Cochran's knowledge of, and acquiescence in, those practices. Such allegations strike us as adequate to state a claim based on municipal custom, particularly in the case of a pro se plaintiff.
 
 
 32
 Moreover, if plaintiff succeeds in proving a city policy of discrimination based on the actions of a "final policymaker," he would have no need to prove in addition a custom or practice of racial discrimination. It was therefore premature, at best, to dismiss the claims against the city.[11]
 
 
 33
 Thus, as with the Sec. 1983 claims against the individual defendants, we reverse the district court's dismissal of plaintiff's Sec. 1983 claim against the City of Fort Lauderdale and remand for further proceedings.
 
 III. Section 1981 Claims
 
 34
 Even though plaintiff's Sec. 1981 claims and the impact on them of Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), occupied a lion's share of the briefs and arguments in this case, we decline to address them. In Jett v. Dallas Indep. School Dist., 491 U.S. 701, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989), the Supreme Court held that Sec. 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by Sec. 1981 when the claim is pressed against a state actor." Thus, Brown has no claim for damages against the defendants in this case under Sec. 1981. To the extent that injunctive relief remains available to him under Sec. 1981, it would simply duplicate the equitable relief he could receive under Sec. 1983. We therefore choose to avoid delving unnecessarily into the issues of Sec. 1981's applicability to racially motivated discharges and whether Brown should be allowed at this late date to bring a Title VII action if his Sec. 1981 claims are foreclosed. See Arnold v. Board of Educ. of Escambia County, Ala., 880 F.2d 305, 317 (11th Cir.1989) (declining to consider scope of Sec. 1981 because plaintiffs adequately stated constitutional discrimination claim under Sec. 1983).
 
 IV. Conclusion
 
 35
 We summarize our holdings with respect to each of plaintiffs' claims as follows:
 
 
 36
 (1) The City of Fort Lauderdale may be held liable for a Sec. 1983 violation if discriminatory acts were taken pursuant to either municipal policy or custom. Municipal policy is implicated by the actions of an official who wields "final policymaking authority" in the area of city business at issue. Thus, if Chief Cochran and City Manager Hoffman make final policy for the city on police personnel issues, a finding of liability against them would permit recovery from the city. Municipal liability also may be based on a longstanding custom or practice that has attained the "force of law." Brown has alleged a persistent practice of racial discrimination in evaluating his work performance. The district court therefore prematurely dismissed Brown's Sec. 1983 claim against Fort Lauderdale.
 
 
 37
 (2) The district court erred in concluding that the individual defendants, Cochran and Hoffman, are entitled to qualified immunity on the basis of the pleadings. Brown's right to be free from a racially motivated discharge unquestionably was clearly established before his termination, and factual questions remain concerning whether the decision to fire him was racially motivated.
 
 
 38
 (3) We need not, and therefore do not, address plaintiff's Sec. 1981 claims.
 
 
 39
 The judgments of the district court dismissing this action are VACATED, and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Frank M. Coffin, Senior U.S. Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 We refer throughout to Brown's Second Amended Complaint, which was filed on May 4, 1988
 
 
 [2]
 Neither Chief Cochran nor City Manager Hoffman remain in the municipal positions they held at the time of these events. For convenience, however, we shall refer to them as still holding their former titles
 
 
 [3]
 According to the letter, which was made an exhibit to Brown's complaint, Brown had been allowed to resign from the force in June 1980, two months after he initially was hired, because of poor academic performance in the police academy. He was allowed to reapply in December 1980. In June 1981 his performance report rated him as overall unsatisfactory and his termination was recommended. He instead was placed with another training officer. Although he received overall satisfactory performance reports in all subsequent ratings, until the last one in 1985, one or more problem areas were noted in all but one of these satisfactory reports. The report without noted deficiencies was done in November 1984
 
 
 [4]
 Brown also claims that his original poor rating in 1981 was based on race
 
 
 [5]
 We have described only what seem to us the most pertinent discriminatory actions alleged in plaintiff's prolix complaint
 
 
 [6]
 Brown states in the caption of his complaint that it is brought against the individual defendants in their official capacities. If so, the doctrine of qualified immunity would be inapplicable because an official-capacity suit is, in essence, a suit against the government, Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), and no form of immunity protects a municipality like Fort Lauderdale from civil rights damages. Id. at 167 & n. 14, 105 S.Ct. at 3106 n. 14. See also Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir.1990)
 Despite the caption labeling, however, the remainder of Brown's complaint and "[t]he course of proceedings," Brandon v. Holt, 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985), indicate that all concerned in this case have assumed that Brown seeks to impose liability against the individual defendants in their personal capacities. See Graham, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14. In these circumstances, and particularly in the case of a pro se plaintiff, see Farred, 915 F.2d at 1533, we think it appropriate to disregard the label in the complaint and to treat the individual claims as personal capacity ones.
 
 
 [7]
 We have not reviewed in detail plaintiff's procedural due process claim. The district court on remand should reconsider whether defendants are entitled to qualified immunity on that claim in light of the principles expressed in this opinion
 
 
 [8]
 We note that a plaintiff must show a purpose or intent to discriminate in proving an equal protection violation based on racial discrimination. Arnold v. Board of Educ. of Escambia County, Ala., 880 F.2d 305, 317 n. 16 (11th Cir.1989) (citing Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979))
 
 
 [9]
 Indeed, the city's briefing was of less help than the court should have the right to expect. We suspect that the district court's brief treatment of both the municipal liability and qualified immunity issues is directly attributable to the nature of the briefing it received from the parties, one of whom was a pro se litigant. In such a case, arising in a complex field of law, there is a special need for counsel to exercise care in ensuring that all issues are adequately presented
 
 
 [10]
 Identification of the officials whose decisions represent municipal policy is a legal question to be resolved by the trial judge before the case goes to the jury, Jett v. Dallas Indep. School Dist., 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). The Supreme Court has noted that a judge "may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies," Praprotnik, 485 U.S. at 124-25, 108 S.Ct. at 924-25. Policymaking authority may be shared among individuals or bodies, id. at 126, 108 S.Ct. at 925, and authority to make policy may be granted directly by a legislative enactment or be delegated by an official who possesses such authority, Pembaur, 475 U.S. at 483, 106 S.Ct. at 1300. See also Worsham v. City of Pasadena, 881 F.2d 1336, 1339-40 (5th Cir.1989) & id. at 1342-44 (Goldberg, J., concurring in part and dissenting in part) (detailed discussion of Supreme Court's framework for municipal liability); Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 997-98 (11th Cir.1990) (similar)
 
 
 [11]
 We think it helpful to repeat here a portion of the Supreme Court's recent summary of the process for determining municipal liability, which refers to both the policy and custom aspects of that inquiry:
 Once those officials who have the power to make official policy on a particular issue have been identified [by the trial judge], it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see Monell, 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.
 Jett, 109 S.Ct. at 2723 (emphasis in original) (citing Pembaur, 475 U.S. at 485-87, 106 S.Ct. at 1301-02).