**PUBLISH**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

--------------------------------------------

No. 94-8667

--------------------------------------------

D. C. Docket No. 91-CV-47-2-MAC (WDO)


CAROL FLOYD, CARLA FLOYD, MARY ANN DRAKE,

Plaintiffs-Appellants,
Cross-Appellees,


versus


IRIS WAITERS, Security Chief, Board of Public
Education and Orphanage for Bibb County,
WILLIAM DECKER BOOKER, Security Guard, Board
of Public Education and Orphanage for Bibb
County,

Defendants,


KENNETH BRONSON, Security Guard, Board of
Public Education and Orphanage for Bibb
County, JOHN NICHOLSON, Head of Operations,
Board of Public Education and Orphanage for
Bibb County, STEPHEN MASSEY, President, Board
of Public Education and Orphanage for Bibb
County, THOMAS HAGLER, Superintendent, Board
of Public Education and Orphanage for Bibb
County, HARRY TINKER,

Defendants-Appellees,
Cross-Appellants.

----------------------------------------------------------------

**Appeals from the United States District Court
for the Middle District of Georgia**

----------------------------------------------------------------

**(January 20, 1998)**

Before EDMONDSON and COX, Circuit Judges, and FAY, Senior Circuit Judge.

## EDMONDSON, Circuit Judge:

In this case, we address a question of school district liability for acts of sexual harassment of students by school district employees. Plaintiffs appeal the district court's order granting summary judgment for Defendants on Plaintiffs' Title IX and Section 1983 claims. We conclude that Plaintiffs, as a matter of law, cannot maintain either claim; and we affirm.

## Background

Carol and Carla Floyd (Plaintiffs), students under the authority of the Board of Public Education and Orphanage for Bibb County (BOE), say that William Booker (Booker), a

security guard for the BOE, sexually harassed them.[1]  As a

result,

_____

[1] The district court concluded and found that these facts were undisputed:  In February 1989, fourteen-year-old Carla Floyd was forced by Booker into his car and taken to an abandoned house where Booker ordered her to remove her clothes.  She refused to comply, however; and Booker acquiesced.  A week later, Booker, who was supposed to be driving Carol Floyd (Carla's twin sister) to the Youth Development Center from school, took Carol to the house and raped her.

In March 1989, Booker was fired from his job based on the charges made against him by Plaintiffs.  He entered a guilty but mentally ill plea and served three years of a ten-year prison sentence for false imprisonment and sexual assault of one in custody.

Iris Waiters (Waiters), Booker's supervisor, was charged with obstruction of justice in relation to the crimes involving Plaintiffs.  Waiters was also fired in March 1989.   He was acquitted of the criminal charge but was stripped of his police officer's certification.

No allegations or proof of quid pro quo harassment, such as sex for grades, is before us.

Plaintiffs sued the Bibb school district and a number of school officials under 42 U.S.C. §1983, 20 U.S.C. § 1681(a) (1988) (Title IX), and state law.[2]

Defendants Massey, Hagler, Nicholson, Tinker, and Bronson (collectively "Defendants") filed a motion for summary

---

[2] Plaintiffs sued Booker; Waiters; John Nicholson, Director of Operations; Harry Tinker, former Director of Operations; Thomas Hagler, former BOE Superintendent of Schools; the school district through Stephen Massey, former President of the BOE; and Kenneth Bronson, BOE security guard. Tinker was sued only in his individual capacity and Massey was sued only in his official capacity as President of the BOE; the remainder of the Defendants were sued in their official and individual capacities. On appeal, however, Plaintiffs have not argued that the district court erred by dismissing the claims against the Defendants in their individual capacities.

Plaintiffs claim that Defendants are liable because they knew Booker was abusing his position as a security guard at the school, but they did nothing to stop him. Except for Waiters, who is not a party to this appeal, no evidence shows that the Defendants had knowledge of Booker's misconduct. Plaintiffs say Waiters operated the "Playhouse," an abandoned house in Bibb County that school security guards used for illicit sex (and where Booker took Plaintiffs); that Waiters knew of prior allegations of Booker's sexual misconduct with minors; that male security guards customarily drove female students alone in their cars; and that the BOE inadequately supervised the security department.

judgment on Plaintiffs' Title IX and section 1983 claims. The district court granted the motion, dismissed the pendent state law claims without prejudice, and certified its summary judgment order for immediate appeal. Plaintiffs appealed; Defendants cross-appealed.[3]

## Discussion

A.  Title IX

Plaintiffs contend that they were the victims of intentional discrimination -- based on the sexual harassment by Booker -- in

---

[3]In response to Defendants' motion for summary judgment, Plaintiffs entered several items into evidence, which Defendants then moved to strike. Defendants claim that the district court erred by denying this motion. Because we -- even considering this evidence -- are affirming the summary judgment order, we do not consider Defendants' argument.

violation of Title IX. The relevant provision of Title IX states that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (1988).

We are not the first to write about Title IX. And some things are now established. In <u>Franklin v. Gwinnett County Public Schools</u>, 112 S.Ct. 1028, 1038 (1992), the Supreme Court decided that sexual harassment can be considered discrimination under Title IX. In the light of <u>Franklin</u>, we accept that monetary relief is available to private persons for intentional violations of Title IX. <u>Id</u>. at 1037-38.

In <u>Davis v. Monroe County Board of Education</u>, we set out our understanding of some Title IX basics. For example, Title IX was enacted pursuant to the Spending Clause of Article I, which permits Congress to condition "the receipt of federal funding upon a recipient's compliance with federal statutory directives . . . ." 120

F.3d 1390, 1397 (11th Cir. 1997) (en banc). In other words, "Congress intended Title IX to be a typical contractual spending-power provision." Id. at 1398 (internal quotations and citation omitted). So, recipients -- local school districts -- that accept these federal funds agree to abide by the conditions placed on the funds, which, in essence, forms a "contract." Id. But, the acceptance by the local government must be a knowing one, that is, the local government must be able to ascertain easily what is expected of it if it accepts federal funds: "the Supreme Court has required Congress to give potential recipients unambiguous notice of the conditions they are assuming when they accept federal funding." Id.

From what we have already written about the contractual nature of the liability, we think it follows that, because the contracting party is the grant-receiving local school district, a "Title IX claim can only be brought against a grant recipient [-- that is, a local school district --] and not an individual." Smith v. Metro. Sch. Dist. Perry

**Township**, 128 F.3d 1014, 1019 (7ᵗʰ Cir. 1997); <u>see also</u> <u>Rowinsky v.</u>

<u>Bryan Indep. Sch. Dist.</u>, 80 F.3d 1006, 1012-13 (5ᵗʰ Cir. 1996).

The main issue in this case is by what acts or, perhaps, by whose acts does the local school district become liable to an individual under Title IX.[4]  As an academic matter, one might argue that a number of potential theories of liability should apply.  Our colleagues in the Fifth Circuit have already addressed this question; and we think, for the reasons they explain, they are largely correct.  Therefore, to the extent that <u>Rosa H. v. San Elizario Independent</u> <u>School District</u>, 106 F.3d 648 (5ᵗʰ Cir. 1997), rejected theories of liability, we gratefully adopt and follow that decision.[5]  <u>See</u> <u>also</u>

---

[4]The district court refused to apply common law agency principles to a Title IX claim because under Title VII the term "employer" includes "any agent of such a person," but under Title IX, the term educational "program or activity" is defined as "operations of . . . [a] school system," which does not specifically encompass the "agents" of such an entity.  <u>Compare</u> 42 U.S.C. §2000e(b) <u>with</u> 20 U.S.C. §1687; <u>see</u> <u>also</u> <u>Meritor Sav. Bank v. Vinson</u>, 477 U.S. 57, 72 (1986).

[5]The court first rejected the argument that school boards should be held strictly liable for the acts of their employees under Title IX. <u>Rosa H.</u>, 106 F.3d at 652.  The court also stated that "Title IX does not

<u>Smith</u>, 128 F.3d at 1034 (adopting <u>Rosa H.</u>).  Thus, we basically reject respondeat superior liability (and liability based on other variants of agency law) for local school districts under Title IX.

We also accept and adopt the conclusion in <u>Rosa H.</u> that the grant recipient -- the local school district -- must have actual notice of the pertinent sexual harassment and then fail to act if the school

---

contemplate a theory of recovery based purely on agency law." <u>Id</u>. at 655.  In addition, the court rejected the notion that Title VII principles of liability apply under Title IX.  <u>Id</u>. at 656-58.  In <u>Franklin v. Gwinnett County Public Schools</u>, 911 F.2d 617, 622 (11th Cir. 1990), <u>rev'd on other grounds</u>, 112 S.Ct. 1028 (1992), we had also said -- in dicta -- that Title VII principles did not apply to Title IX cases; and this point was not discussed nor declared to be error on review in the Supreme Court.  <u>See</u> <u>Franklin</u>, 112 S.Ct. at 1032 n.4.

We note that our analysis of Title IX is generally consistent with that of Title VI -- a statutory scheme frequently considered when interpreting Title IX. <u>See</u>, <u>e.g.</u>, <u>Cannon v. University of Chicago</u>,  99 S.Ct. 1946, 1956-57 (1996); <u>Davis</u>, 120 F.3d at 1399; <u>see</u> <u>generally</u> <u>Nelson v. Almont Community Schs.</u>, 931 F.Supp. 1345, 1354 (E.D. Mich. 1996) (recognizing that standards of liability under Title VI are different from traditional agency principles or the general standards of liability under Title VII).

By the way, we are aware that the Supreme Court has recently granted certiorari in a Fifth Circuit case to consider the standard-for-liability issue.  <u>See</u>  <u>Doe v. Lago Vista Indep. Sch.  Dist.</u>,  (U.S. Dec. , 1997).

**10**

district is to incur liability under Title IX. <u>Rosa H.</u> 106 F.3d at 658-59. We cannot follow <u>Rosa H.</u> completely, however.

As we understand Title IX, we believe the school district can be liable only for the school district's own acts or omissions: institutional misconduct is the basis for institutional liability.[6] So, we cannot agree that notice of sexual harassment can be imputed to the school district -- that is, the kind of notice that triggers the necessity for the school district's leaders to act or else the district will be held liable for violating Title IX -- whenever a harassing employee's supervisor, with the authority to take action to end such abuse, has knowledge of the harassment. <u>See</u> <u>id</u>. at 659-60.

To us, the <u>Rosa H.</u> interpretation of notice to the school district is, itself, a kind of vicarious liability based on respondeat superior. And we -- for the reasons set out in <u>Rosa H.</u> and here -- reject such liability. Instead, to determine the extent of a school district's liability, we must look at the statutes and regulations -- that is, the

---

[6]"[W]here th' offense is, let the great axe fall." William Shakespeare, Hamlet act 4, sc. 5.

11

notice -- that existed when the school district accepted Title IX funds and made the "contract" not to discriminate.[7] As we have said, the relevant statute under Title IX prohibits discrimination in any "program or activity." 20 U.S.C. § 1681(a). Section 1687 defines "program or activity" as "all of the operations of -- (B) a local educational agency (as defined in § 8801 of this title), system of vocational education, or other school system." 20 U.S.C. § 1687. Section 8801, in turn, defines "a local education agency" as:

> (A) . . . a public board of education or other public authority <u>legally constituted within a State</u> for either <u>administrative control or direction</u> of, or to perform a

---

[7]At this point, we stress that what we are considering is a "snapshot" in time, that is, what notice the BOE had during the period at issue in this case when it accepted Title IX funding. But, the process of accepting Title IX funding -- and, thereby, making "contracts" not to discriminate -- is an ongoing process. As statutes and regulations change, so too will the notice available to grant recipients about the obligations of accepting federal funding. We decide only the extent of liability to be imposed on the school district in the circumstances of this case.

On March 13, 1997, the Department of Education's Office for Civil Rights issued a final policy guidance addressing school district liability for sexual harassment of a student. We say nothing about the significance of these guidelines, except to observe that they may have significance if school districts accept Title IX funds after their announcement.

service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties <u>as are recognized in a State</u> as an administrative agency for its public elementary or secondary schools.

20 U.S.C. § 8801(18) (emphasis added).  Thus, the provisions of Title IX direct us to state law to determine who is responsible for the "administrative control or direction" of the school district under Title IX.[8]  <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 128 F.3d at 1020-21.

In this case, the BOE and Bibb school system were created by an Act of the Georgia General Assembly in 1872, which has  been amended on many occasions.  <u>See</u> Ga. L. 1872, p. 388, as amended

---

[8]Without writing about the federal regulations in detail, we note that they are consistent with this proposition.  Like the statutes, the regulations prohibit a "recipient" from permitting or performing discrimination in any education program or activity.  34 C.F.R. § 106.31 (1989).  "Recipient," in turn, is defined as "any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof . . . ."  34 C.F.R. § 106.2(h) (1989).  And, the regulations define "Educational Institution" as "a local education agency,"  34 C.F.R. § 106.2(j) (1989), which, in turn, is defined by the code in the same manner as it is in 20 U.S.C. § 8801(18).  <u>See</u> 20 U.S.C. § 3381 (1990); 20 U.S.C. § 2891(12) (1990).  Thus, the regulations, like the statutory provisions, direct us to state law.

by Act approved March 21, 1968, Ga. L. 1968, p. 2835, as amended by Act approved April 30, 1969, Ga. L. 1969, p. 3999, as amended by Act approved April 10, 1971, Ga. L. 1971, p. 3926, as amended by Act approved April 2, 1992, Ga. L. 1992, p. 5264. Now, the BOE consists of ten members, eight of which are elected by general election. See Ga. L. 1971, p. 3926. The superintendent of schools, however, is appointed by the BOE and serves at its pleasure. See Ga. L. 1968, p. 2835.

Since its creation, the Bibb school district has been recognized as an "independent school system" under Georgia law, which excepts it from certain constitutional changes that occurred in 1877 and 1945. See Board of Pub. Educ. and Orphanage for Bibb County v. Zimmerman, 231 Ga. 562, 565-66 (1974). But, aside from those exceptions, "[the Bibb school system] is subject to constitutional change and to general laws adopted by the General Assembly of Georgia." Id. at 566.

Georgia law includes this provision:

> The local school superintendent shall be the <u>executive officer</u> of the local board of education; . . . [i]t shall be the <u>local school superintendent's</u> duty to <u>enforce</u> all regulations and rules of the State School Superintendent and of the local board according to the <u>laws of the state and the rules and regulations made by the local board</u> that are not in conflict with state laws . . . .

Ga. Code Ann. § 20-2-109 (emphasis added). So, when a school district accepts funds per Title IX, the school district, in effect, makes the Title IX standard part of its own regulations. This statute designates the local school superintendent as the party responsible for ensuring the school district's compliance with its statutory and regulatory obligations, such as Title IX.[9]

---

[9]Just as federal statutes and regulations may be modified, and, therefore, change the liability attributable to a grant recipient, we also recognize that -- because Title IX incorporates state law -- the liability of a school district may vary from state to state, as well as within a state, depending upon the unique features of each state's laws. These differences will necessarily impact on the notice that grant recipients have about liability when accepting Title IX funding. Thus, in this case, we can only decide the extent of liability for the BOE under Georgia law; we do not determine the extent of liability for all school districts.

Thus, we think that the federal statutes and regulations incorporate -- under Georgia law -- the local school superintendent into the statutory scheme.[10] There was simply no notice -- as required for Spending Clause legislation -- to the school board that enforcement responsibilities under Title IX and, in turn, the power to bring monetary liability onto the school district would extend beyond the superintendent and school board to lower employees.[11]

_____

[10]We recognize that each "recipient" is required to have a Title IX employee "to coordinate its efforts to comply with and carry out its responsibilities under [Title IX]." 34 C.F.R. § 106.8(a). But, if the pertinent employee in Bibb County is not the superintendent, then no such person has been made a party to this action, nor referred to by the parties. As a result, the role of a Title IX coordinator -- again, if it is someone in addition to the superintendent -- is not before this court today; and we do not decide what effect, if any, notice to this person would have on a school district's liability under Title IX.

[11]For the law to be otherwise would be cumbersome and costly given the number of supervisors and employees within a school system. We doubt that Congress intended to place that burden on local school boards, that is, we doubt that the contract formed by the school district's acceptance of Title IX funding can be "breached" by any employee that simply supervises another employee. If Congress wanted to create such a scheme, then it could have done so much more plainly.

Our concern is not merely theoretical. In many school districts

We think this standard for when school districts can be held liable under Title IX is correct. We stress that, as a practical matter, our understanding of Title IX does not make the rights created under Title IX meaningless or almost meaningless. School superintendents and school board members are local public officials to whom letters are easily sent and who often appear at public meetings and receive constituent phone calls.[12] They can -- for example, by reasonable

---

-- especially with tens of thousands of students -- some supervising positions may be five or six steps removed from the board of education and the superintendent of schools. We do not think that school districts, in reality, have actual knowledge -- the knowledge to support potentially million-dollar liability for the school district -- whenever, for example, a deputy assistant director of transportation (but no one higher-up) may know that a bus driver is harassing someone or the foreman (but no one higher-up) of the district's emergency plumbing crew has knowledge of misconduct, and these supervisors could fire (but do not) the harassers.

[12]As stated above, the BOE consists of officials elected in staggered general elections. See Ga.L. 1971, p. 3926. As elected officials, such persons commonly can be, and (we expect) are, contacted easily and regularly to report misconduct by school employees. In addition, the BOE holds public meetings at which parents or citizens can raise their concerns about the schools. See, e.g., Hatcher v. Board of Pub. Educ. and Orphanage for Bibb County, 809 F.2d 1546, 1557 (11th Cir. 1987) (discussing how parents

17

efforts of parents and students -- be put on notice of misconduct.  If the superintendent or school board then does nothing, the school district can be liable.[13]  And, such liability fits the contractual nature of Title IX; a school board  -- the party that accepts Title IX funding for

_____

protested school closings at public Board meetings).

[13]While we have focused on the notice to be provided to the superintendent of schools, we recognize that -- as a matter of state law -- the conduct (or inaction) of the local school board will often be critical to the school district's liability.  Under Georgia law, a superintendent:

> [M]ay temporarily relieve from duty any teacher, principal, or other employee having a contract for a definite term for [misconduct], pending hearing by the local board in those cases where the charges are of such seriousness . . . that such . . . employee could not be permitted to continue [work] . . . without danger of . . . serious harm to the school, its mission, pupils, or personnel.

Ga. Code Ann. § 20-2-940(g).  The superintendent, however, may not fully suspend or terminate an employee for misconduct, which action probably is the school district's method for correcting violations of Title IX.  Instead, only the local school board may perform these acts.  See Ga. Code Ann. § 20-2-940(a), (e), (f).  As a result, school district liability for most of its employees' misconduct is necessarily tied to the acts of the local school board itself because, in Georgia, a lower-ranking supervisor may not have the authority to force the end of misconduct and violations of Title IX.

a school district and makes the "contract" -- is the only party that can "breach" the terms of the Title IX "contract."

It is true that sexual misconduct is usually covert; but we have no good reason to think that Congress intended to place substantial monetary liability on local school districts for the secret misconduct of employees -- except perhaps for secret misconduct of a superintendent himself. We see nothing in the language of Title IX to the contrary or that puts the BOE on notice of a liability beyond what we recognize today. School districts can be liable to individuals for breaching their contract with the national government; but, in the light of the contractual nature of the liability, their liability -- at least when based on pre-March 1997 occurrences -- cannot be based on the respondeat superior doctrine. For liability in Georgia, the superintendent or the board must have actual knowledge[14] of the

---

[14]Plaintiffs have shown no evidence of deliberate ignorance. Therefore, we do not decide today whether liability might result if a superintendent or school board were consciously and deliberately ignorant of sexual harassment.

19

sexual harassment and then fail to take reasonable steps to end the abuse.

In this case, the record reveals no evidence that Hagler[15] -- the BOE superintendent of schools -- or the school board members were ever aware of Booker's conduct before the incidents at issue here, nor does it show a failure to take remedial action once necessary. Thus, no liability exists under Title IX: the school district, as an institution, has not been shown to have intentionally discriminated against the Plaintiffs. The district court did not err by granting summary judgment on the Title IX claim.

---

[15]In fact, Plaintiffs have not demonstrated that any of the Defendants-Appellees knew about the Playhouse and the activities conducted there. Plaintiffs have only shown that Booker, Waiters (who were at least three levels removed from the superintendent of schools position), and a few others (who are not parties to this appeal) had knowledge of these activities. The record amply demonstrates that these men took great pains to ensure that their activities -- which were potentially crimes in Georgia -- remained secret. As such, we conclude that the BOE cannot be held liable under Title IX.

**B.    Section 1983**

Plaintiffs also claim that the district court erred by granting summary judgment and finding the school district not liable under section 1983 for Booker's misconduct.  A municipality may be held liable under section 1983 for the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" that causes the deprivation of federal rights.  Monell v. Department of Social Servs., 98 S.Ct. 2018, 2037-38 (1978); see Pembaur v. City of Cincinnati, 106 S.Ct. 1292, 1297 (1986).  But, it is well established that a municipality may not be held liable under section 1983 on a theory of respondeat superior.  See Monell, 98 S.Ct. at 2037-38; Pembaur, 106 S.Ct. at 1297; Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991); Mandel v. Doe, 888 F.2d 783, 791 (11th Cir. 1989).  Instead, "only deprivations undertaken pursuant to governmental 'custom' or

'policy' may lead to the imposition of governmental liability." Mandel, 888 F.2d at 791. As the Supreme Court stated in Pembaur, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' -- that is, acts which the municipality has officially sanctioned or ordered." 106 S.Ct. at 1298.

As a result, Plaintiffs assert three theories of recovery against the school district: (1) that Waiters, Tinker, and Nicholson had final policymaking authority over the school's security force and established a "policy" of sexual harassment that caused Plaintiffs' injuries; (2) that improper "customs" existed within the school district; and (3) that the school district failed to train or to supervise the security department. Despite Plaintiffs' contentions, we find all arguments unpersuasive.

1. Policy

In <u>Brown</u>, we wrote that "a municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority."  923 F.2d at 1480; <u>see</u> <u>also</u> <u>Scala v. City of Winter Park</u>, 116 F.3d 1396, 1399 (11th Cir. 1997).  But, as the Supreme Court wrote in <u>Pembaur</u>, "not every decision by municipal officers automatically subjects the municipality to § 1983 liability. . . .  The fact that a particular official -- even a policymaking official -- has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  106 S.Ct. at 1299-1300.  Thus, liability results when the "municipal official possesses the authority and responsibility for establishing <u>final</u> policy with respect to the issue in question."  <u>Mandel</u>, 888 F.2d at 793 (emphasis in original).  Further, the determination of whether an official has final policymaking authority is a question of state law to be decided by the

23

court.  See Brown, 923 F.2d at 1480 (citing Jett v. Dallas Indep. Sch. Dist., 109 S.Ct. 2702, 2723 [1989]); Mandel, 888 F.2d at 793.

Here, Plaintiffs contend -- in essence -- that Waiters, Tinker, and Nicholson had final policymaking authority over the security department because "a custom and practice developed so that the policy was that [Waiters, Tinker, and Nicholson were] authorized to function without any supervision or review at all."  Mandel, 888 F.2d at 794; see Manor Healthcare Corp. v. Lomelo, 929 F.2d 633, 638 (11th Cir. 1991).  Then Plaintiffs say that, because Waiters, Tinker, and Nicholson were final policymakers  and because the misconduct at issue here fell within the ambit of their policymaking authority, the school district should be liable for Plaintiffs' injuries.

Other than general allegations, Plaintiffs have provided no evidence or support for the claim that these Defendants had final policymaking authority over the security department.  Georgia law states that only the BOE is authorized to establish the rules and regulations that govern the operation of the school district.  See Ga.

24

L. 1872, p. 388, as amended by Act approved March 21, 1968, Ga. L. 1968, p. 2835.  In addition, "a school board has no authority, by contract or otherwise, to delegate to others the duties placed on the board by the Constitution and laws of Georgia."  <u>Chatham Ass'n. of Educators, Teachers Unit v. Board of Pub. Educ. For the City of Savannah and the Cty. Of Chatham</u>, 231 Ga. 806, 807-08 (1974).

As a result, Plaintiffs have -- at most -- demonstrated only that these Defendants had some "discretion" in the performance of their jobs.  But, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority."  <u>Mandel</u>, 888 F.2d at 792.  And, that the BOE did not continually investigate and review those decisions does not alter this conclusion.  As the Supreme Court wrote: "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority . . . ."  <u>City of St. Louis v. Praprotnik</u>, 108 S.Ct. 915, 928 (1988).   Nothing evidences that these Defendants were not "constrained by official

25

policies and [that their actions were] not subject to review." Scala, 116 F.3d at 1399 (quoting Mandel, 888 F.2d at 792).

And, at least one example discussed by Plaintiffs about Tinker's (so-called) policymaking authority supports our conclusion that these Defendants, in fact, had no final policymaking authority. In 1984 or 1985, Tinker produced a booklet about rules and procedures for school security. The record reveals, however, that the booklet was given to and reviewed by the BOE before its dissemination to school security guards, that is, Tinker's "policymaking" was reviewed. This court has consistently held that "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Morro, 117 F.3d at 514; see Scala, 116 F.3d at 1401 (citing Manor, 929 F.2d at 638).[16]

---

[16]Also, the BOE's chain of command prevented these Defendants from having final policymaking authority over the security department. Waiters was supervised by the Director of Operations (Tinker and Nicholson); who were, in turn, supervised by the Associate Superintendent of Finance and Support; who was, in turn,

Thus, we conclude that the district court did not err by finding and concluding that Waiters, Tinker, and Nicholson had no final policymaking authority; section 1983 liability cannot be based on this theory.

## 2.    Custom

The Supreme Court said in <u>Monell</u> that a municipality may be sued for deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 98 S.Ct. at 2036.  And, in <u>Brown</u>, we set out this standard:

> To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express

supervised by the Superintendent of Schools; who ultimately reported to the BOE.  This structure demonstrates that the security department did not operate independently of the BOE and that the policies of these Defendants were ultimately subject to review by the BOE.

municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."

923 F.2d at 1481 (internal quotations and citations omitted). Put differently, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Id. Thus, Plaintiffs can maintain their section 1983 claim if they can demonstrate that a custom existed, that the custom caused a deprivation of Plaintiffs' federal rights, and that the custom was so widespread that the BOE was aware of the custom but failed to end it. See id.; City of Canton v. Harris, 109 S.Ct. 1197, 1203 (1989).

In granting summary judgment to Defendants on Plaintiffs' section 1983 claim, the district court found that security guards' driving students without chaperons in privately-owned vehicles contrary to written policy[17] was a persistent and widespread custom

---

[17]Tinker wrote an eight-page booklet when he was Director of Operations which, among other things, said that security guards should only transport students after receiving a written request from the principal and only with school administrator or teacher

of the school district. But, the district court decided that mere acquiescence in this custom was insufficient to support governmental liability because an inadequate causal connection linked the custom and Plaintiffs' injuries; the court concluded that the custom was too "far removed" from Plaintiffs' injuries. See Canton, 109 S.Ct. at 1203.

On appeal, Plaintiffs argue that the district court mis-characterized the custom at issue.[18] They contend that the longstanding and widespread custom was that male security guards transported female students from school campuses to the "Playhouse," which was operated by the security department for the

---

accompaniment. The security department, however, never followed the procedures.

[18]Plaintiffs also argue that the district court erred by finding no causal link between the custom of permitting unsupervised transportation of students and Plaintiffs' injuries. This argument is unavailing; Plaintiffs have shown no sufficient causal link between that custom and their injuries. See Canton, 109 S.Ct. at 1203; Wyke v. Polk County Sch. Bd., 129 F.3d 560, 568 (11th Cir. 1997); Young v. City of Augusta, Ga., 59 F.3d 1160, 1171 (11th Cir. 1995); Parker v. Williams, 862 F.2d 1471, 1477 (11th Cir. 1989).

purposes of engaging in illicit sex.[19] We conclude, however, that this conduct does not constitute a school district "custom" that could support section 1983 liability.

As noted above, a "custom" requires that policymaking officials knew about the widespread practice but failed to stop it. See Brown, 923 F.2d at 1481. Here, Plaintiffs have provided no evidence that policymaking officials -- the BOE -- knew about the Playhouse or the activities that occurred there.[20] And, in fact, the record shows just the opposite -- that the Playhouse was concealed from school officials. Nothing concrete supports the claim that the conduct was

---

[19]We have been cited to no evidence, however, that other schoolgirls -- besides the Plaintiffs themselves -- were ever taken to the Playhouse by employees of the security department.

[20]Plaintiffs stress Waiters's involvement in the activities of the Playhouse to support their characterization of the custom in this case. Waiters's participation, however, is not particularly significant. Liability attaches only where the municipality -- acting through its policymaking officials -- allows the improper custom to occur. See Young, 59 F.3d at 1171; Brown, 923 F.2d at 1481. While Waiters may have been involved in the activities of the Playhouse, he was not -- as discussed above -- a policymaking official.

"so permanent and well settled as to constitute a 'custom or usage' with the force of law." Brown, 923 F.2d at 1481 (internal quotations and citations omitted). As a result, this characterization of the custom is not sufficient for section 1983 liability.

### 3. Failure to Train and to Supervise

Plaintiffs also argue that the school district is liable under section 1983 for failing to train and to supervise the security department properly. We have recognized that a municipality's failure to train or supervise may be actionable under section 1983 if it evidences a "deliberate indifference" -- again, by policymaking officials -- to the rights of the inhabitants of the municipality because "such a shortcoming [may] be properly thought of as a city 'policy or custom' . . . ." Vineyard v. County of Murray, 990 F.2d 1207, 1212 (11th Cir. 1993); see Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489-90 (11th Cir. 1997); see also Canton, 109 S.Ct. at 1204-05. But, in

<u>Sewell</u>, we adopted the Second Circuit's interpretation of this principle:

> Where the proper [course of conduct] . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not "so likely" to produce [improper conduct] as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.
>
> * * *
>
> The Supreme Court has made clear that § 1983 does not subject municipalities to liability whenever municipal employees go astray.  It is only when the municipality itself wreaks injury on its citizens that municipal liability is appropriate. . . . [And when misdeeds] relate to such basic norms of human conduct[,] . . . a municipal policymaker need not expend precious resources on training or supervision but can instead rely on the common sense of her employees.

<u>Walker v. City of New York</u>, 974 F.2d 293, 299-300, 301 (2d Cir. 1992); <u>see</u> <u>Sewell</u>, 117 F.3d at 490.  A pattern of known misconduct, however, may be sufficient to change reasonable reliance into deliberate indifference.  <u>Id</u>.

Applying the reasoning of <u>Sewell</u> and <u>Walker</u> to the facts of this case, we conclude that the BOE did not act with deliberate

32

indifference to the training and supervision of the security department. Booker's conduct and the operation of the Playhouse were clearly against the basic norms of human conduct. The pertinent conduct was a crime in Georgia. Without notice to the contrary, the BOE was entitled to rely on the common sense of its employees not to engage in wicked and criminal conduct. The record contains no evidence that this reliance ever rose to the level of deliberate indifference by policymaking officials. See Canton, 109 S.Ct. at 1205 (stating that liability requires a "deliberate" or "conscious" choice by a municipality). The district court did not err by granting summary judgment to Defendants on the section 1983 claim.[21]

AFFIRMED.[22]

---

[21]Plaintiffs also seek liability against Hagler, Nicholson, Tinker, and Bronson in their officials capacities. But, local government liability can result only from conduct by policymaking officials. Canton, 109 S.Ct. at 1205. For the reasons discussed above, none of these parties are policymaking officials so as to support municipal liability.

[22]Plaintiffs also claim the district court erred by: (1) ruling that

Booker had a Fifth Amendment privilege for acts of sexual misconduct outside the incidents involving Plaintiffs; (2) ordering a psychiatric report and evaluation of Booker to remain sealed; and (3) granting BOE's motion for a protective order. Discovery orders are subject to review for abuse of discretion. <u>Farnsworth v. Proctor & Gamble Co.</u>, 758 F.2d 1545, 1547 (11th Cir. 1985). The district court did not abuse its discretion in its rulings on these discovery matters.

In addition, Defendants cross-appeal the district court's denial of their motion to strike certain items of evidence filed by Plaintiffs in response to Defendants' motion for summary judgment. Plaintiffs say the evidence, which consists of police reports, witness statements, newspaper articles, transcripts of state and administrative proceedings, and affidavits, supports their contention that BOE security guards used the Playhouse to have illicit sex with schoolgirls and that the BOE should have known of Booker's proclivities.

The district court granted Defendants' motion for summary judgment after reviewing <u>all</u> of the contested evidence. In the light of the fact that we affirm that summary judgment, we need not discuss the question presented and dismiss Defendants' cross-appeal as moot.

34