Leroy BUNYON, Plaintiff,

v.

BURKE COUNTY; Burke County Sheriff's Department; Gregory T. Coursey, Sheriff, Individually and in his Official Capacity as Sheriff of the Burke County Sheriff's Department; Johnny Patterson, Sergeant, Individually and in His Capacity for the Burke County Sheriff's Department; Robert L. Saulsberry, Sergeant, Individually and in his Official Capacity for the Burke County Sheriff's Department; Wayne Scott, Lt., Individually and in his Official Capacity for Burke County; John H. Bush, Jr., Capt., Individually and in his Official Capacity for the Burke County Sheriff's Department; City Of Midville; Midville Police Department, Bruce Anderson, Chief of Police, Individually and in his Official Capacity as the Chief of Police for the City of Midville; Leroy Morgan, Investigator,

Individually and in His Official Capacity for the City of Midville Police Department; Wesley Lewis, Sergeant, Individually and in His Official Capacity for the City of Midville Police Department, Defendants.

No. CV–102–007.

United States District Court,
S.D. Georgia,
Augusta Division.

Sept. 30, 2003.

Wade K. Copeland, Richard M. Pierro, Jr., Carlock, Copeland, Semler & Stair, LLP, Atlanta, GA, for Plaintiff.

Maren R. Frost, M. Diane Owens, Christopher D. Balch, Swift, Currie, McGhee & Hiers, LLP, Atlanta, GA, for Defendants, Burke County, Burke County Sheriff's Department, Gregory T. Coursey, Johnny Patterson, Robert L. Saulsberry, Wayne Scott, and John H. Bush, Jr.

Phillip E. Friduss, Cynthia A. Daley, Hall, Booth, Smith & Slover, PC, Atlanta, GA, Michael G. Frick, Hall, Booth, Smith & Slover, PC, Brunswick, GA, for Defendants, City of Midville, Midville Police Department, Bruce Anderson, Leroy Morgan and Wesley Lewis.

## ORDER

BOWEN, Chief District Judge.

Plaintiff Leroy Bunyon ("Bunyon") filed suit in the above-captioned case pursuant to 42 U.S.C. § 1983 against twelve defendants: (1) Burke County, Burke County Sheriff's Department, Gregory T. Coursey, Johnny Patterson, Robert Saulsberry, Wayne Scott and John H. Bush, Jr. (collectively "the Burke County defendants"); and (2) City of Midville, Midville Police Department, Bruce Anderson, Leroy Morgan, and Wesley Lewis (collectively "the Midville defendants"). Presently before the Court are three motions: (1) a motion for summary judgment by the Burke County defendants (Doc. No. 45); (2) a motion for summary judgment by the Midville defendants (Doc. No. 51); and (3) a motion for partial summary judgment by Bunyon (Doc. No. 57). For reasons stated more fully below, the Midville defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. Furthermore, Bunyon's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**. By Order of even date herewith the Court's consideration of the Burke County defendants' motion and Bunyon's motion regarding the Burke County defendants will be held in abeyance until further briefing is complete. A recently issued opinion from the Eleventh Circuit has potentially changed the analysis of liability for Sheriffs, Sheriffs' deputies, and jail personnel and may hold great import for the Burke County defendants. *See Manders v. Lee*, 338 F.3d 1304 (11th Cir.2003). The parties have been invited to submit briefs on the effect of the *Manders* case on the liability of the Burke County defendants.

## I. BACKGROUND

### A. The Arrest and Detention of Leroy Bunyon

On July 12, 2000 and August 14, 2000, two citations were issued to Plaintiff Leroy Bunyon ("Bunyon") for under-age possession of alcohol and under-age consumption of alcohol, respectively. (Doc. No. 76 ¶ 1.) The Court hearings for these two citations were scheduled for August 29, 2000 and September 26, 2000 (*id.* ¶ 2), but Bunyon did not appear for either hearing (Doc. No. 54 ¶ 3). Following Bunyon's failure to appear, Defendants assert that the Midville Recorders Court Clerk mailed a DPS–912 notice to Plaintiff's last known address (*id.* ¶ 4), the purpose of which was to inform Bunyon of his failure to appear and to instruct him that he had twenty (20) days to clear his fines and court costs before any further action against him was taken. (*Id.* ¶ 5.) Bunyon, however, denies ever seeing the Notice (Doc. No. 84 ¶ 4), and he never paid his fines nor appeared in court. (*Id.* ¶ 6.)

In November 2000, Judge Charles Hillis ("Judge Hillis") apparently began the process of issuing a bench warrant due to Bunyon's failure to appear in court, but the warrant was never completed nor served and the incomplete document lay in Bunyon's court file for several months. (Doc. No. 54 ¶¶ 7 & 8.)

On March 5, 2001, Defendant Leroy Morgan ("Morgan"), who is a part-time investigator for the City of Midville (located in Burke County) and a full-time Deputy Marshall with neighboring Jefferson County, reviewed the court records and noted that Bunyon had failed to appear for his scheduled hearings. (*Id.* ¶¶ 9 & 10.)

Defendants contend that Morgan was unaware that a previous bench warrant had been started but never served (*id.* ¶ 11) and claim that Morgan brought to Judge Hillis' attention the fact that Bunyon had failed to appear for prior hearings (*id.* ¶ 12). Bunyon denies this assertion. (Doc. No. 84 ¶ 12). Defendants maintain that both Morgan and Judge Hillis believed the bench warrant issued for Bunyon was for failure to appear. (Doc. No. 54 ¶ 13.) On March 5, 2001, Defendants assert that Judge Hillis issued a second bench warrant for Bunyon (*id.* ¶ 15).

The warrant issued on March 5, 2001 that eventually led to Bunyon's arrest is in sharp dispute. Bunyon, for example, disputes that a "bench warrant" was ever issued, stating that "[a]t no time was a bench warrant issued for the arrest of the Plaintiff." (Doc. No. 84 ¶ 15.) Bunyon further asserts that he was eventually arrested pursuant to a "warrant for arrest." (Doc. No. 59 ¶ 26.) Defendants contend that, in fact, Bunyon was arrested pursuant to a "bench warrant." (Doc. No. 87 ¶ 26.) Defendants explain, "the warrant signed by Judge Hillis is captioned 'Warrant for Arrest' but [they] deny the warrant was anything other than a bench warrant for failure to appear." (*Id.* ¶ 27.) Despite the assertion by Defendants that the warrant was issued for Bunyon's failure to appear in court, they admit that "[t]he warrant references only the charge of under-age drinking and does not include the charge of failing to appear." (Doc. No. 59 ¶ 28; Doc. No. 87 ¶ 28.) Further, the parties do not agree on who issued the warrant: Bunyon insists that the warrant was actually issued by Harry Whitehead, Mayor of Midville, at the insistence of Morgan (Doc. No. 59 ¶ 31), while Defendants counter that the warrant was issued by Judge Hillis, who "had previously ordered the issuance of [it]" (Doc. No. 87 ¶ 29). Prior to the arrest of Bunyon, Morgan had never arrested anyone pursuant

to a bench warrant for the City of Midville. (Doc. No. 59 ¶ 34.)

Following the issuance of the warrant on March 5, 2001, Morgan stopped a vehicle driven by Cynthia Kirkland ("Kirkland"), Bunyon's sister, in Jefferson County on March 13, 2001 for the purpose of arresting Leroy Bunyon ("Bunyon"), a passenger. (*Id.* ¶¶ 1 & 2.) Defendants assert that Morgan effected the arrest pursuant to the warrant that had been issued on March 5, 2001. (*Id.* ¶ 3.) Defendants further claim that Morgan stated to Bunyon that he was under arrest for failure to appear at his hearings (Doc. No. 54 ¶ 18); Bunyon counters that Morgan actually told him that "he was being arrested for the two tickets issued for under age drinking" (Doc. No. 84 ¶ 18). Defendants maintain that Morgan informed Kirkland that she could contact the City Clerk to find out the amount of Bunyon's fines in order to have him released from jail (Doc. No. 54 ¶ 19); again, Bunyon claims that "Morgan did not inform the Plaintiff's sister ... that she could contact the City Clerk to find out the amount of the Plaintiff's fine" (Doc. No. 84 ¶ 19). Indeed, Defendants claim that Kirkland visited the Clerk's Office on or about two days after Bunyon's arrest in an effort to pay his fines, but was unable to do so because she did not have enough money. (Doc. No. 54 ¶ 20.) Bunyon states that rather than not having enough money to pay his fine, Kirkland was told by Morgan that Bunyon could not be released until he appeared before a judge, and thus Kirkland did not attempt to return to pay Bunyon's fines. (Doc. No. 84 ¶ 20.)

Following the arrest, Morgan took Bunyon to the Jefferson County Sheriff's Department for holding until he had finished his responsibilities for Jefferson County, his other employer. (*Id.* ¶ 6.) Bunyon contends that he was "arrested sometime be-

tween four and six o'clock on the early evening of March 13, 2001, [but] the booking report at the Burke County Jail indicates that [he] was not processed in until eleven o'clock that evening." (Doc. No. 83 ¶ 3.) Approximately a half hour after arriving at the Jefferson County Sheriff's Department, Morgan took Bunyon to the Midville Police Department. (*Id.* ¶ 7.) Once at the Police Department, Bunyon was questioned regarding some unsolved burglaries that had taken place in the Midville area. (*Id.* ¶ 8; Doc. No. 76 ¶ 3.) Bunyon asserts that "Morgan conceded that no one had ever claimed they saw Leroy involved in the burglaries" (Doc. No. 59 ¶ 8.), but Morgan insists that he "had received information that 'Mr. Bunyon was seen in those areas, known areas during the time frame of the burglaries'" (Doc. No. 87 ¶ 8). Morgan acknowledges that he did not have probable cause to arrest Bunyon in connection with the burglaries. (Doc. No. 59 ¶ 9.) After Bunyon was interrogated, Morgan and Wesley Lewis ("Lewis"), an officer of the Midville Police Department, transferred Bunyon to the Burke County Jail in Waynesboro, Georgia, where he was incarcerated (*id.* ¶ 10); the arrest warrant was also transferred to Burke County (*id.*). The transfer to the Burke County Jail was necessary because the City of Midville does not have a jail of its own and has an agreement with Burke County to house any of its arrestees. (Doc. No. 54 ¶ 23.)

In order to effect his release from the Burke County Jail, Bunyon was required to pay a fine. (*Id.* ¶ 14.) Bruce Anderson ("Anderson"), the Chief of Police of the Midville Police Department, testified by deposition that Plaintiff's fine was $860. (*Id.* ¶ 15.) At the time of his arrest, Bunyon was carrying $975 in cash. (*Id.*) However, Defendants claim that Morgan was not aware that Bunyon was carrying any cash. Bunyon maintains that he offered to pay his fine with the cash on his person (*id.* ¶ 16.), but Defendants deny Bunyon ever made such an offer. (Doc. No. 87 ¶ 16.) According to Defendants, "Morgan did not know the amount of the fine and the clerk's office was closed precluding any taking of money" (*id.* ¶ 16). Bunyon, however, asserts that "Morgan stated that if the Plaintiff did not produce information regarding the [aforementioned] burglaries, the Plaintiff would be taken to jail." (Doc. No. 59 ¶ 17.) Defendants deny Morgan ever made such a statement. (Doc. No. 87 ¶ 17.)

Sergeant Lula Ervin ("Ervin") of the Burke County Jail testified by deposition that she attempted three times to contact the City of Midville by phone to notify them that Plaintiff wanted to pay his fine, but each time she heard only a recording with 911 information and was never able to speak with anyone from the City of Midville. (Doc. No. 59 ¶ 20; Doc. No. 81 ¶¶ 21 & 22.) Ervin apparently called Midville because she was told by Captain Bush that "because Plaintiff was arrested by the City of Midville, Bunyon 'had to pay [his fine] at Midville.'" (Doc. No. 81 ¶ 20 (quoting Ervin Dep. at 14).)

The parties disagree on some of the details following Bunyon's arrest and subsequent incarceration at the Burke County Jail. The parties agree that the Clerk's Office was generally open five days a week, and was open the morning following Bunyon's arrest. (*Id.* ¶ 23.) However, Bunyon contends that Morgan did not inquire about the fine amount the following day or anytime thereafter. (*Id.* ¶ 24.) Defendants respond that Morgan did not inquire because Bunyon already knew his fine amount. (Doc. No. 87 ¶ 24.) Morgan visited the Burke County Jail a couple of days following the arrest to interrogate Bunyon about the burglaries (*id.* ¶ 25), but Defendants insist that Bunyon requested the meetings (*id.* ¶ 25).

The parties agree that Bunyon remained in the Burke County Jail from March 13, 2001 until March 25, 2001 (*id.* ¶ 12) and was never taken to a judicial officer subsequent to his arrest (*id.* ¶ 13). Defendants state that Morgan did not have to take Bunyon before a judicial officer, at least for a determination of a bond amount, because "Plaintiff's fine (bond) amount was pre-set...." (*Id.* 87 ¶ 38.) The parties also agree that it was the City of Midville's policy to keep an arrestee in jail until his court date if he could not pay his fine (Doc. No. 59 ¶ 49); however, "[t]he City of Midville's municipal judge holds open court only once per month" (*id.* ¶ 50).

## B. Bunyon's Medical Problems

Defendants assert that sometime between March 13, 2001 and March 21, 2001, Bunyon was doing push-ups or otherwise exercising in his cell at the Burke County Jail, when his back and shoulder were injured. (Doc. No. 76 ¶ 5.) Bunyon informed Nurse Katie Young ("Nurse Young"), the on-call jail nurse, that his back and shoulders were hurting. (*Id.*) Defendants claim that Bunyon told Nurse Young that he had done more than 200 push-ups (*id.*), but Bunyon denies ever having made such a statement (Doc. No. 83 ¶ 5.). Nurse Young then examined Bunyon in her office on March 21 (Doc. No. 76 ¶ 6) at which time Bunyon had no complaints about the condition of his legs (*id.* ¶ 7).

Thereafter, on March 23 at 3:00 a.m., Bunyon began "kicking and banging on his cell door with his legs" (*id.* ¶ 9) and complaining to Sergeant Johnny Patterson ("Patterson") that he was not feeling well and had "back problems." (*Id.* ¶ 8.) Patterson advised Officer Robert Saulsberry ("Saulsberry") in "Main Control" about Bunyon's condition and his behavior. (*Id.*) Defendants assert that Patterson and Nurse Young concluded that Bunyon's back pain was not serious based on his

ability to kick and bang on his cell door (*id.* ¶ 10) and that Nurse Young would check on Bunyon's condition later (*id.*).

Later in the morning, Officer Jacqueline Bush ("Officer Bush") arrived on her shift and distributed medications to cell blocks A and B. (*Id.* ¶ 11.) Bunyon indicated to Officer Bush that he was in pain and asked for Tylenol. (*Id.*) Officer Bush gave Bunyon two Tylenol and contacted Main Control about Bunyon's complaint. (*Id.*) Various inmates also told Officer Bush at approximately 1:30 p.m. on March 21 that Bunyon was "hurting." (*Id.* ¶ 12.) Officer Bush informed the inmates that she would advise the sergeant on duty, Ervin, about Bunyon's complaint; Bush did so and Ervin contacted Nurse Young at home. (*Id.* ¶ 13.) The staff then determined to take Bunyon to see a physician after Captain John Bush ("Captain Bush") made an appointment for him with a physician. (*Id.* ¶ 14.)

At approximately 3:30 p.m. on March 23, 2001, Bunyon was taken by the Burke County Jail staff to see a doctor. (*Id.* ¶ 15.) Bunyon says that when he arrived, he was actually examined by a physician's assistant, Andrea Doak. (Doc. No. 83 ¶ 15.) Bunyon received shots of Norflex and Toradol and a prescription for various medications, including Flexeril and Ibuprofen; X-rays were also taken. (Doc. No. 76 ¶ 16.) The medical note from this visit indicates no problems with Plaintiff's extremities. (*Id.* ¶ 17.) Bunyon then returned to the Burke County Jail at approximately 5:00 p.m. (*Id.* ¶ 19.)

After Bunyon's return to the jail, Defendants assert that Officer Bush observed Bunyon standing on a set of stairs talking with several other inmates. (*Id.* ¶ 20.) Defendants claim Officer Bush told Bunyon to "come downstairs," since he was not supposed to be climbing the stairs due to his injury (*id.*), and that Bunyon com-

plied and sat at a table (*id.* ¶ 21). Defendants maintain that neither Bunyon nor any other inmates made any complaints to Officer Bush about Bunyon's condition at that time. (*Id.*) At approximately 11:45 p.m. on March 23, 2002, Defendants claim that Bunyon was "walking up and down the stairs" (*id.* ¶ 22), though Bunyon claims he had to be assisted up the stairs (Doc. No. 83 ¶ 22). The next day, Bunyon received his prescribed medications at 7:30 a.m., 5:15–5:45 p.m., and at approximately 8:30 p.m. (Doc. No. 76 ¶ 23.) Defendants claim that no Burke County jailers received any complaints regarding Bunyon's condition, with the exception of Ervin, who received a call from an unknown officer that Bunyon was in pain. (*Id.* ¶ 25.) Bunyon contradicts this statement claiming that his "fellow inmates complained to the guards on duty throughout the day of Mr. Bunyon's deteriorating condition." (Doc. No. 83 ¶ 25.) Ervin again contacted Nurse Young at home about Bunyon's condition, and Nurse Young simply instructed Ervin to administer Bunyon's medication to him. (Doc. No. 76 ¶ 26.)

At approximately 5:15 p.m. on March 24, Ervin found Bunyon sitting at a table. (*Id.* ¶ 27.) Ervin gave Bunyon his medication. (*Id.* ¶ 28.) Defendants claim that Bunyon did not make any complaints to Ervin at that time, though Bunyon claims that inmate Tracy Attaway ("Attaway") reported to Ervin that Bunyon needed medical attention (Doc. No. 83 ¶ 28). Bunyon claims that Attaway also reported to various guards on duty that Bunyon needed medical attention, including Officer Cassandra Haynes ("Haynes"), who distributed medications to the A block of the jail at approximately 8:30 p.m. on March 24. (*Id.* ¶ 31; Doc. No. 76 ¶ 29.) Haynes then contacted Patterson and requested that he come to the A block. (Doc. No. 76 ¶ 32.)

Defendants assert that Bunyon testified that he was "not having problems with his legs until after 8:00 or 9:00 p.m. on Saturday, the 24th, he was just suffering from severe back pain." (*Id.* ¶ 43.) Bunyon, in contrast, states that he was confused as to the dates and times of the events of the last two days of his incarceration and that he also "testified that he was experiencing a feeling of loss of sensation, or a loss of feeling in his legs on the *morning* of March 24, 2001" (Doc. No. 83 ¶ 43 (emphasis added)), though he apparently did not tell any jail personnel about the problems with his legs until 9:00 p.m. on March 24 (Doc. No. 76 ¶ 44) when he informed Patterson that his legs were getting numb (*id.* ¶ 45).

Sometime during the evening of March 24, jail officials attempted to "lock down" the inmates. (Doc. No. 54 ¶ 43.) However, several inmates, led by Attaway, refused to enter their cells stating that Bunyon needed medical attention. (*Id.*) Three inmates, Joe Hughes ("Hughes"), Thaddeus Kirkland ("Kirkland"), and Greg Jordan ("Jordan") informed the jailers that Bunyon needed to be taken to the hospital. (Doc. No. 76 ¶¶ 35 & 36.) Bunyon recalls informing Saulsberry that he needed to go to the emergency room. (Doc. No. 83 ¶ 33.) Defendants claim that Hughes, Kirkland, and Jordan were told by Patterson and Saulsberry that the jail staff were aware of Bunyon's condition and that he had already been seen by a physician. (*Id.* ¶ 37.)

At 11:00 p.m., Saulsberry purportedly contacted Main Control about Bunyon's complaints. (Doc. No. 76 ¶ 34.) Defendants further allege that at approximately 12:22 a.m. on Sunday, March 25, Saulsberry called Haynes in Main Control instructing her to contact 911. (*Id.* ¶ 46.) While Haynes was on the phone, Saulsberry told her that Bunyon was complaining of back pain. (*Id.* ¶ 47.) At some point during these events, Defendants claim that Pat-

terson, who was conducting the lock down, "informed Attaway and company that medical had been called, but they could not be allowed on the block until all inmates, including them, were locked down." (Doc. No. 54 ¶ 44.) Bunyon, though, contends that Patterson "did not contact emergency medical personnel *until* the inmates refused to lock down and demanded emergency medical attention for the Plaintiff." (Doc. No. 84 ¶ 44 (emphasis added).)

Emergency medical personnel arrived at the jail at approximately 12:44 a.m. (Doc. No. 76 ¶ 48.) The emergency medical personnel took Bunyon to the Burke County Hospital because he was complaining of loss of feeling from his chest downwards as well as incontinence. (Doc. No. 84 ¶ 46.) The Burke County Hospital could not treat Bunyon's injuries, and he was transported to the Medical College of Georgia where he was diagnosed with a subdermal hematoma (Doc. No. 76 ¶ 48; Doc. No. 54 ¶ 46; Doc. No. 84 ¶ 46); Bunyon later underwent two surgeries (Doc. No. 76 ¶ 48). Following his surgeries to relieve the pressure on his spinal cord, Bunyon was transferred to Shepard's Spinal Center in Atlanta, Georgia where he underwent rehabilitation treatment. (Doc. No. 54 ¶ 50.)

Prior to his transport, Chief Anderson verbally authorized the release of Bunyon. (*Id.* ¶ 48.) Defendants claim that Sheriff Gregory Coursey was not present at the Burke County Jail on Saturday and Sunday, March 24–25, and was not aware of any of Bunyon's complaints on those two days. (*Id.* ¶ 49.) Defendants further assert that Captain Bush was not aware of any of Bunyon's problems on Saturday, March 24 and only became aware of his problems in the early morning hours of Sunday, March 25. (*Id.* ¶¶ 50 & 51.) Finally, Defendants claim that Lieutenant Wayne Scott ("Scott") had little or no information about Bunyon's condition and

that even Bunyon can only recall telling Scott that his pain was getting worse on Saturday evening and cannot recall seeing him any other time that Saturday. (*Id.* ¶¶ 52–54.)

## II. *REQUIREMENTS FOR SUMMARY JUDGMENT*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor...." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the nonmoving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that

there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark*, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick*, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving parties notice (Doc. Nos. 46, 52, 58) of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ready for consideration.

## III. *ANALYSIS*

Bunyon has brought both federal and state law claims. Bunyon's claims arise out of alleged violations that occurred (1) because of his detention and (2) as a result of the allegedly poor and untimely medical care he received at the Burke County Jail. The nature of this case effectively divides Defendants into two groups: (1) the "Burke County defendants"—Burke County, Gregory T. Coursey, Johnny Patterson, Robert Saulsberry, Wayne Scott, and John H. Bush, Jr.; and (2) the "Midville defendants"—City of Midville, Midville Police Department, Bruce Anderson, Leroy Morgan, and Wesley Lewis. A recently issued opinion from the Eleventh Circuit, *Manders v. Lee*, 338 F.3d 1304 (11th Cir.2003), has potentially changed the analysis of liability for sheriffs, sheriff's deputies, and jail personnel; therefore, this Order will address only the issues pertaining to the Midville defendants.

### A. Claims Arising from Bunyon's Detention

Based on his arrest and detention, Bunyon asserts he is entitled to summary judgment on one constitutional claim [1] and one state-law claim. (Doc. No. 57.)

*Due Process Claim:* Bunyon claims that because he was not brought before a judicial officer within the time prescribed by law, or otherwise released following his arrest on March 13, 2001, his right to due process was violated by Morgan. (Doc. No. 60 at 13–18.) Bunyon asserts that the City of Midville and Burke County are liable for this violation because they had a custom, policy, or practice of deliberate indifference to such rights. (*Id.* at 16–23.)

*False Imprisonment Claim:* Bunyon asserts that Morgan is liable for false imprisonment for failing to bring him before a judicial officer within the time prescribed by law. (Doc. No. 57 ¶ 7.) Bunyon claims that the City of Midville and Burke County are liable for this violation because they had a custom, policy, or practice of deliberate indifference to such behavior.[2]

Defendants have filed cross motions for summary judgment asserting that neither the individual defendants [3] nor Burke County and the City of Midville are liable.

#### 1. *The Due Process Claim*

##### a. *Applicable Federal Law*

■ Bunyon asserts that the Defendants have violated his state-created liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *See Meachum v. Fano,* 427 U.S. 215, 223, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law."); *Fuentes v. Wagner,* 206 F.3d 335, 341 n. 8 (3d Cir.2000) ("Fuentes' [a pretrial detainee] liberty interests are grounded in the Fourteenth Amendment because his allegations are against state actors as he was confined in a county prison."). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), *overruled on other grounds by, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Stated differently, Bunyon (1) may attempt to show that Defendants' actions directly contravened the United States Constitution,[4] or

---

1. Bunyon claims in his motion (Doc. No. 57) that because no one gave him an opportunity to post bond following his arrest, Defendants violated his right to be free from excessive bail as established by the Eighth and Fourteenth Amendments. This claim is related to the facts giving rise to the due process claim. However, Bunyon has not addressed this issue in his brief and has provided no other argument concerning it. Thus, I consider the claim abandoned.

2. Bunyon asserts that Burke County is also liable for these violations, but I am deferring decision on Burke County's liability until further briefing is received. In addition, Bunyon has asserted claims against Burke County, Sheriff Coursey, and various deputies for intentional infliction of emotional distress, medical expenses, and deliberate indifference to his serious medical needs. Burke County's liability on these claims will also be addressed after further briefing is concluded.

3. The term "individual defendants" refers to all Defendants except the municipal Defendants and the non-suable entities.

4. "[T]he paradigmatic liberty interest under the due process clause is freedom from incarceration." *Oviatt v. Pearce,* 954 F.2d 1470, 1475 (9th Cir.1992). Thus, arbitrary incarceration by a state government implicates the Due Process Clause. Bunyon may have had a right to be released without relying on Georgia law to create a protectable liberty interest, but he has not made this argument and I do not address it.

(2) he may attempt to show that Georgia has promulgated statutes or policies creating a liberty interest protected by the Due Process Clause.[5] Bunyon has chosen to assert that Georgia law creates a liberty interest protected by the Due Process Clause that Defendants have denied him. (Doc. No. 60 at 14–17.)

■ A "state creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). "[T]he most common manner in which a State creates a liberty interest is by [1] establishing 'substantive predicates' to govern official decision-making, and, further, by [2] mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002). Thus, the question of whether Bunyon has a protected liberty interest begins with Georgia law.

b. *Applicable Georgia Law*

■ Georgia law mandates that any "arresting officer *shall* take the arrested person before the most convenient and accessible judicial officer authorized to hear the case...." O.C.G.A. § 17–4–21 (emphasis added). More specifically, "[e]very law enforcement officer arresting under a *warrant shall ... in any event* present the person arrested before a committing judicial officer *within 72 hours after arrest.*" *Id.* § 17–4–26 (emphasis added).

In the case of a bench warrant, "every person so arrested must be committed to jail *until bail is tendered.*" *Id.* § 17–7–90 (emphasis added).[6] The Georgia Code provides that the judge of any court of inquiry may by written order establish a schedule of bails, and a person charged with committing an offense "*shall* be released from custody upon posting bail as fixed in the schedule." *Id.* § 17–6–1(f)(1) (emphasis added). Importantly, Georgia law provides that "at *no time* ... shall any person *charged with a misdemeanor* be refused bail." *Id.* § 17–6–1(b) (emphasis added).[7] For all persons who have been authorized by law or a court to be released on bail, "sheriffs and constables *shall* accept such bail...." *Id.* § 17–6–1(j) (emphasis added).

The language of the relevant Georgia statutes utilizes the mandatory term "shall" and curtails an official's discretion to detain a pretrial detainee or otherwise deny him bail. Thus, I conclude that Georgia's statutes create a liberty interest, protectable by the Due Process Clause of the United States Constitution, in (1) being brought before a judge in 72 hours and in (2) being allowed to post bail on a misdemeanor charge.

c. *Defendants' Contentions*

■ Despite the clear directives of the Georgia code, Defendants state that Bunyon's incarceration did not amount to a due process violation. First, they contend that the warrant under which Bunyon was arrested is a "bench warrant", which they assert alters Bunyon's substantive rights.

5. As one court has explained, "[a] state statute cannot 'create' a federal constitutional right .... [s]tate statutes may establish liberty ... interests protected by the Due Process Clause...." *Harrill v. Blount County*, 55 F.3d 1123, 1125 (6th Cir.1995).

6. Section 17–7–90 provides, however, that *any* judicial officer or the sheriff of the county

where the charge was returned can receive the bail. *Id.*

7. The offense listed on the "Warrant for Arrest" was for "purchasing [an] alcoholic beverage (underage)". The purchase of alcoholic beverages underage is prohibited by O.C.G.A. § 3–3–23(a)(2). This offense is a misdemeanor. *See* O.C.G.A. § 3–3–23.1(Supp.2000).

(Doc. No. 80 at 9–10.) Bunyon, in contrast, asserts that he was arrested under the authority of a "warrant for arrest." (Doc. No. 60 at 7.) However, regardless of whether the warrant is denominated an arrest warrant or a bench warrant, Defendants' obligations did not change.[8] Assuming, *arguendo*, that the warrant was a bench warrant, the Georgia Code still provides that any law enforcement officer "arresting under a warrant *shall ... in any event* present the person arrested before a committing judicial officer within 72 hours after arrest." *Id.* § 17–4–26 (emphasis added). Section 17–4–26 does not distinguish between types of warrants, and it does not carve an exception if a court has established a bail schedule. Further, the Georgia Supreme Court has stated that § 17–4–26 is a "directive[ ] to the arresting officer to take the arrestee before a judicial officer within the prescribed time, or release the arrestee." *Watts v. Pitts*, 253 Ga. 501, 322 S.E.2d 252, 255 (1984).

In addition, and in regard to bail, the Georgia Code states that "at *no time ...* shall any person *charged with a misdemeanor* be refused bail." *Id.* § 17–6–1(b) (emphasis added). This provision does not except bench warrants from its applicability. Defendants appear to contend that Bunyon's arrest under a bench warrant for failure to appear diminishes his right to post bail. (Doc. No. 86 at 10.) However, the Georgia courts have stated that "holding a person in jail as some sort of punishment for having been arrested under a bench warrant is not a recognized procedure in Georgia." *Allen v. State*, 244 Ga. App. 377, 535 S.E.2d 347, 349 (2000).

Thus, Bunyon's substantive rights under the relevant statutes in this case were not altered. Bunyon should have been granted bail.

Defendants have also argued that because the warrant was (in their opinion) a bench warrant issued by Judge Hillis, Bunyon had to be returned to Judge Hillis before bail could be accepted. (Doc. No. 80 at 12) ("A bench warrant is not like other warrants.... When the warrant is issued for the failure of the defendant to appear, only the judge issuing the warrant may set the bail.") Under Georgia law, however, "[n]o judicial officer except a judge of the superior court shall issue a special warrant for arrest returnable only before himself...." O.C.G.A. § 17–4–42. The fact Defendants denominate the warrant a "bench warrant" is of no consequence since under Georgia law "[a] bench warrant is merely an arrest warrant issued by a judge." *Kametches v. State*, 242 Ga. 721, 251 S.E.2d 232, 234 (1978). Thus, Judge Hillis had no authority to issue a warrant forcing Bunyon to appear only before him and, by extension, had no right to force Bunyon to deliver bail only to him.

d. *Liability of the Individual Defendants*

Having concluded that Georgia law creates a liberty interest in being brought before a judge within three days or in being allowed to post bail to be released if charged with a misdemeanor, I must now address (1) whether Bunyon has produced evidence that he suffered a constitutional deprivation and (2) which defendants, if any, may be liable.[9]

---

**8.** It is noteworthy, however, that the "Warrant for Arrest" that Defendants are attempting to characterize as a "Bench Warrant" is a close facsimile of the standard "Form of Warrant for Arrest" found in O.C.G.A. § 17–4–46. Furthermore, the "Bench Warrant" included with Coursey's deposition testimony as Exhibit 4 is a much different form.

**9.** The United States Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Thus, I look to whether

## (1) Leroy Morgan

### (a) *Morgan's failure to bring Bunyon before a committing judicial Officer*

██ Bunyon contends that Defendant Morgan was responsible for taking him before a judicial officer. (Doc. No. 60 at 15–17.) Because he failed to do so, Bunyon contends that Morgan is liable for his constitutional deprivations. (*Id.* at 17.)

Georgia law clearly mandates that an arrestee in Bunyon's circumstances be brought before a judicial officer. O.C.G.A. §§ 17–4–21, –26. Furthermore, the Georgia code specifically places this burden on the arresting officer. *Id.* §§ 17–4–26, –26. Morgan admits that (1) he was the arresting officer (Morgan Dep. at 14), and that (2) he did not believe it was necessary to take Bunyon before a judicial officer (*id.* at 19).[10] In fact, Morgan made the following comments about his efforts to take Bunyon before a judge:

Q. Did you take him [Bunyon] before any judicial officer?

A. No.

Q. Why didn't you do that?

A. Normally they [sic] just sit—be incarcerated until the next court date to be brought before a judicial officer.

(*Id.* at 43.) Because the Midville Recorder's Court only holds session once a month, Morgan's position by implication was that an arrestee could be incarcerated for approximately 30 days without being brought before a judge.

Morgan asserts that he did not need to bring Bunyon before a judge because Bunyon was told the amount of his fine, but nonetheless decided not to pay. (Doc. No. 86 at 10.) Georgia law, O.C.G.A. § 17–4–26, does not obviate the need to take an arrestee before a committing officer because a schedule of bails has been established. Even assuming Bunyon did *not* want to post his bail, the judicial process does not stop. It was still necessary to bring Bunyon before a judge. Bunyon's motion on this portion of his due process claim is **GRANTED** and the Midville defendants' motion is **DENIED**. Damages will be determined by a jury. *See Zinermon v. Burch*, 494 U.S. 113, 134 n. 19, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

### (b) *The Posting of Bail*[11]

██ Bunyon asserts that neither Morgan nor Burke County officials afforded him an opportunity to post bail. (Doc. No. 60 at 15–17.) Under Georgia law, Bunyon could not be refused bail because he was charged with a misdemeanor. O.C.G.A. § 17–6–1(b). Further, upon the posting of bail, those officials responsible for incarcerating an arrestee are obligated to release him, *id.* § 17–6–1(f)(1), and sheriffs and constables shall accept the bail offered by an arrestee. *Id.* § 17–6–1(j).

Morgan's testimony indicates that he felt he did not have a responsibility to accept money from Bunyon or even to tell him the scheduled bail amount:

Q. Is it your understanding that if a person is arrested under a bench

a violation of the Constitution has occurred under the facts and evidence presented by Bunyon.

10. The dialogue was as follows:
 Q. Is it your understanding that if a person is arrested under a bench warrant that they have a right to go before a judicial officer or a magistrate to have a bond set?

A. No. No, sir.

11. The parties use the words "fine", "bail", and "bond" interchangeably, but presumably intend for them to have the same meaning. *See* Doc. No. 86 at 10 ("Plaintiff's fine and court cost amounts (his bond amount) was pre-set . . .").

warrant that they have a right to go before a judicial officer or a magistrate to have a bond set

A. No. No, sir.

(Morgan Dep. at 19–20.)

. . .

Q. [H]ow does the person find out what they can pay [in bail] to get out?

A. Well, that's the Clerk of Court. They have to see the Clerk of Court and they will give the fine how much they have to pay.

Q. How does the prisoner find out from the Clerk of Court how much that amount is?

A. Well, an inmate can make a phone call, family members, and that's one of the ways that I would suggest they find out.

Q. Okay. If they ask or tell you that they want to pay their fine and be on their way, what are you supposed to do?

A. Advise them to see the city clerk.

. . .

Q. Okay. You wouldn't undertake to do that for them?

A. I would—it would not be my responsibility.

(*Id.* at 21.)

Even to the extent Morgan did explain how Bunyon could pay his fine and be released, he testified that he told Bunyon's sister, and not Bunyon. (*Id.* at 42.) Morgan testified that Bunyon did not ask to pay his fine and that he did not have any money on his person to pay it. (*Id.* at 32.) In fact, Morgan maintains that he performed a pat down on Bunyon and did not find any cash. (*Id.* at 33.)

Whether Bunyon had money on his person at the time of his arrest or whether he made an offer to pay his fine is irrelevant to whether he must be given an opportunity to post bail. Morgan testified that he did not feel it was his responsibility to (1) advise Bunyon of his fine or bail amount, (2) accept money from him, or (3) call the Midville City Clerk's Office to find out the relevant information. Thus, Bunyon was left with the task of discovering the information himself, without the benefit, according to Morgan, of being taken to a judge within 72 hours.

In addition, testimony from Cynthia Kirkland stated that Morgan told Bunyon's family members that they "could not pay to get Leroy out of jail [because] . . . Leroy had to wait for an appearance in front of the Judge." (Doc. No. 85 at Ex. A (Cynthia Kirkland Aff. ¶ 7).) If Morgan made such a statement, Bunyon's outside help in getting released from jail would have been useless.

Bunyon has provided evidence that neither he nor Burke County jail officials could contact anyone in the City of Midville to either verify the bail amount or accept Bunyon's money. Sergeant Ervin of the Burke County Jail testified that she did not usually check a prisoner's eligibility for bail (Ervin Dep. at 11), and could not, in any event, accept Bunyon's money (*id.* at 14). Furthermore, Ervin stated that she tried to call Midville approximately three times without any success in reaching anyone. (*Id.* at 14.) Burke County's refusal to accept Bunyon's money, the unavailability of the Clerk's Office in the City of Midville, Morgan's alleged statements to Bunyon's family that he could not pay his fine before seeing a judge, Morgan's unwillingness to accept Bunyon's bail, and Bunyon's incarceration meant that Bunyon had no means of posting bail and being released. Yet, Ervin said that Bunyon (1) had the money and (2) wanted to pay his fine. (*Id.* at 13.)

Defendants' motion for summary judgment is **DENIED**. However, until the

factual disputes of (1) whether Morgan told Bunyon's family they could not pay his fine until he saw a judge and (2) whether Bunyon had money on his person when he was incarcerated are resolved, I will **DENY** Bunyon's motion for summary judgment and this claim will go to trial.

### (2) Anderson

Bruce Anderson, chief of police for the City of Midville, has moved for summary judgment asserting that he is not liable for Bunyon's excessive detention. (Doc. No. 53 at 18.) Anderson claims that he was not involved in Bunyon's arrest and that Bunyon has not stated a basis for supervisory liability. (*Id.*) Bunyon contends that Anderson need not have been personally involved because he promulgated a policy that led to the violation of Bunyon's rights. (Doc. No. 85 at 12.)

The Eleventh Circuit has held that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999) (internal quotation marks and citation omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 & 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold an official in a supervisory position liable, Plaintiff must demonstrate that either (1) the supervisor personally participated in the alleged constitutional violation or (2) there is a causal connection between actions of the supervising official and the alleged constitutional violation. *Hartley*, 193 F.3d at 1269 (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990)). The "causal connection" can be established "when a history of *widespread abuse* puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," *id.* (emphasis added), or when "the supervisor's improper *'custom or policy* ... result[s] in deliberate indifference to constitutional rights.'"

*Id.* (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir.1991)) (emphasis added).

■ Bruce Anderson, as Chief of the Midville Police Department, was Morgan's supervisor, and Morgan's actions comport with Anderson's recitation of the policy of the City of Midville. As Anderson explained, "Once ... we turn them [prisoners] over to the jail he [the prisoner] belongs to the jail. We don't have nothing else to do with him." (Anderson Dep. at 19 (emphasis added).)

Anderson was also posed with this question: "[D]oes Midville consider itself as having any responsibility for making sure that the prisoner has been given the opportunity to pay his fine and be on his way?" (*Id.* at 20.) Anderson responded, "Not on a bench warrant." (*Id.*) Again Morgan's actions were consistent with the policy enunciated by Anderson. Finally, Anderson gave the following testimony:

Q. Was there any effort to make sure that Leroy Bunyon knew that he could pay a fine and be released?

A. Not by me.

Q. Any effort at all by Midville?

A. I don't—I don't know.

Q. Do you think some effort should have been made in that regard?

A. No, sir, I think he should have come to court like he was summons [sic] to do and straightened it out on his own ... and ... it's up to him to get out.

(Anderson Dep. at 29–30.)

Anderson stated that neither he, his officers, nor the City of Midville was under any obligation to inform Bunyon of his bail amount. (Anderson Dep. at 19.) Anderson later firmly stated that Midville has no responsibility to make sure that a prisoner has been given an opportunity to

post his bail when he has been arrested on a bench warrant, as Bunyon was. (*Id.* at 20.)

Despite this testimony, Anderson also testified that it was acceptable for an officer, like Morgan, to tell an arrestee his "fine" amount (*id.* at 21–22), and he could not think of a reason why a prisoner would sit in jail for 12 days without being told his "fine" amount. With testimony indicating a policy both to tell and not to tell an arrestee his bail or fine amount, a question of fact concerning which policy was actually the policy of the City of Midville exists for a jury to decide. Thus, summary judgment is **DENIED** on Plaintiff's motion to hold the City of Midville liable for an unconstitutional policy of refusing to accept bail for a pre-trial detainee. This claim will go to trial.

### (3) Lewis

■ Wesley Lewis has moved for summary judgment. (Doc. No. 53 at 18.) Lewis is a part-time employee for the City of Midville. (Wesley Dep. at 13.) Lewis' involvement in Bunyon's arrest and subsequent detention was minimal and limited to the following events. Lewis initially issued Bunyon two citations for drinking underage and possessing alcohol under age. (*Id.* at 49.) Much later, after Bunyon was arrested, Lewis listened as Morgan read Bunyon his *Miranda* rights (*id.* at 49, 51–52) and then accompanied Morgan in a police vehicle when custody of Bunyon was turned over to Burke County. (*Id.* at 53.) On the trip, Lewis completed the "booking sheet" for Bunyon. (*Id.*) These events are the extent of the evidence of Lewis' involvement.

Lewis was not the arresting officer (*id.* at 50–51) and did not issue the warrant leading to his arrest. Furthermore, Lewis was not involved in the events at the Burke County jail or in the interrogation of Bunyon. Simply stated, there is no causal connection between Lewis and any harm suffered by Bunyon. As a result, Lewis' motion for summary judgment is **GRANTED** and he is **DISMISSED** from this case.

### (4) Qualified Immunity of Morgan and Anderson

Qualified immunity protects government officials from liability in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). If Bunyon's constitutional right would have been violated under his version of the facts, "the next, sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Finally, "[q]ualified immunity is not available to municipal governments. [Their] liability is judged under the standards set forth in *Monell v. Dept. of Soc. Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56

L.Ed.2d 611 (1978)." *Harrill v. Blount County*, 55 F.3d 1123, 1126 (6th Cir.1995).

Morgan and Anderson each seek qualified immunity. (Doc. No. 53 at 19–20.) I have already determined that Bunyon suffered a constitutional violation, and now turn to the question of whether the law securing Bunyon's right not to be excessively detained was clearly established.

"For a constitutional right to be clearly established, its contours must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739, 122 S.Ct. 2508 (internal quotation marks omitted). As the Court explained, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (citations and internal quotation marks omitted). Stated differently, "[w]hen a state or federal official asserts qualified immunity, he claims that his actions were reasonable in light of clearly established law." *Nevada v. Hicks*, 533 U.S. 353, 400, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). As the *Hope* court expressed, the relevant question is whether the state of the law gave Defendants fair notice that their treatment of Bunyon was unconstitutional. *Id.* at 740, 122 S.Ct. 2508.

■ I conclude that at the time of Bunyon's incarceration, the law clearly established that a pre-trial detainee could not be detained for twelve days without being brought before a judge or allowed to pay bail. *See* O.C.G.A. §§ 17–4–26, 17–6–1(b). The relevant statutes guiding law enforcement officers in their treatment of pre-trial detainees were in force prior to Bunyon's detention. Furthermore, the Georgia Supreme Court's opinion that O.C.G.A. § 17–4–26 is a "directive to the arresting officer to take the arrestee before a judi-cial officer within the prescribed time, or release the arrestee," *Watts*, 322 S.E.2d at 255, had been in effect for more than 15 years.

In addition, United States Supreme Court decisional law clearly established that when a state creates a liberty interest, the Due Process Clause of the United States Constitution protects that interest. *See Meachum v. Fano*, 427 U.S. 215, 223, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). I conclude that in light of pre-existing law, the unlawfulness of Morgan's actions and Anderson's policy were evident to a reasonable official. As such, both Morgan and Anderson are not entitled to the protection afforded by qualified immunity.

e. *Liability of the City of Midville*

A local government can only be liable for official policies or customs that violate a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This liability can be established in two ways. First, a plaintiff can point to a widespread practice that "although not authorized by written law or express municipal policy, causes a constitutional deprivation and is so permanent and well-settled as to constitute usage and custom with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). In the alternative, a plaintiff can show that his rights were violated by a single decision by a "particular official who possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 1480 (quoting *Pembaur v.*

*City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Significantly, a local government is not liable under a theory of respondeat superior. *Denno v. School Bd. of Volusia County,* 218 F.3d 1267, 1276 (11th Cir.2000). Instead, a municipal government is liable for only those injuries which result from "the actions of an official fairly deemed to represent government policy." *Id.*

■■■ Anderson, as Chief of Police for the city of Midville, was in a position to establish policy for the city. Based upon the evidence adduced by Bunyon, I have determined that he may have, depending on the finding of the jury, promulgated a policy of (1) excessive detention of pre-trial detainees arrested on bench warrants and (2) not accepting bail from pre-trial detainees arrested on misdemeanor charges. Anderson's policy was the moving force behind the infringement of Bunyon's constitutional rights as Morgan's actions were in conformity with the policy set forth by Anderson. Anderson was sued in his individual and official capacities. The City of Midville may be liable for Anderson's actions in his official capacity. Until the jury determines which policy Anderson actually promulgated, the City of Midville may not be dismissed. As a result, Bunyon's motion for summary judgment on the issue of the liability of the City of Midville is **DENIED.** Defendants' motion for summary judgment on the issue of liability of the City of Midville is likewise **DENIED.**

### f. *The Midville Police Department*

■■■ Federal Rule of Civil Procedure 17 states, in pertinent part, the following:

(b) **Capacity to Sue or Be Sued.** The capacity of an individual, other than one acting in a representative capacity, to sue or be sued should be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law

under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held. . . .

Fed.R.Civ.P. 17(b). In *Georgia Insurers Insolvency Pool v. Elbert County,* 258 Ga. 317, 368 S.E.2d 500 (1988), the Georgia Supreme Court set forth the following explanation of which entities could sue and be sued in Georgia courts:

[T]his court [has] said, in every suit there must be a legal entity as the real plaintiff and the real defendant. This state recognizes only three classes as legal entities, namely: (1) natural persons; (2) an artificial person (a corporation); and (3) such quasi-artificial persons as the law recognizes as being capable to sue.

*Georgia Insurers Insolvency Pool,* 368 S.E.2d at 502 (quoting *Cravey v. Southeastern Underwriters Ass'n,* 214 Ga. 450, 105 S.E.2d 497, 500 (1958)). The Eleventh Circuit has advised that "[s]heriff's departments and police departments are not usually considered legal entities subject to suit. . . ." *Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir.1992). In *Shelby v. City of Atlanta,* the Northern District of Georgia stated that a claim could not be brought against a police department:

Plaintiff cannot state a claim against the City of Atlanta Police Department because the Department is not a proper party defendant. The Department is an integral part of the City of Atlanta government and is merely the vehicle through which the City government fulfills its policing functions. For this reason, the Department is not an entity subject to suit and plaintiff's claim against it is hereby dismissed.

578 F.Supp. 1368, 1370 (N.D.Ga.1984). Based upon Georgia law and cases from this circuit, the Court can find no basis for

allowing Plaintiff to sue the Midville Police Department. Therefore, it is **DISMISSED**.[12]

### 2. *The False Imprisonment Claim*

a. *Whether Bunyon's Claim Survives Summary Judgment*

 "False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal property." O.C.G.A. § 51–7–20; *see also Miraliakbari v. Pennicooke*, 254 Ga.App. 156, 561 S.E.2d 483 (2002). According to Georgia law, "[i]n an action to recover damages for … false imprisonment the only essential elements are the detention and the unlawfulness thereof." *Miller v. Grand Union Co.*, 250 Ga.App. 751, 552 S.E.2d 491, 494 (2001).

 The Georgia courts have refined the false-imprisonment claim when an arrest and detention is made pursuant to legal process:

> When the detention is predicated upon *procedurally valid process,* false imprisonment is *not* an available remedy, … because detention effectuated pursuant to procedurally valid process, such as an arrest warrant, is not "unlawful." …
> In the event that procedurally *void or defective* process is secured, there is a cause of action for false imprisonment, *but only* if the process was itself secured in bad faith.

*Erfani v. Bishop*, 251 Ga.App. 20, 553 S.E.2d 326, 330 (2001) (quoting *Williams v. Smith*, 179 Ga.App. 712, 348 S.E.2d 50, 52–52 (1986)) (emphasis in original). If the process used to effect detention is valid, an "action for malicious prosecution is the only remedy." *Miller*, 552 S.E.2d at 494 (quoting *Joseph v. Home Depot, Inc.*, 246 Ga.App. 868, 542 S.E.2d 618, 622

(2000)). Based on Georgia law, the initial question is whether the warrant that Morgan used to arrest Bunyon was valid. I conclude that it was defective.

 The warrant in this case is a "warrant for arrest" because it is very similar to the "Form of Warrant for Arrest" found in O.C.G.A. § 17–4–46. (Coursey Dep. at Ex. 3.) This warrant contained the information required by § 17–4–41 for an arrest warrant, including (1) the name of the offense, (2) the place of the offense, (3) the date of the offense, and (4) the county in which the offense took place. O.C.G.A. § 17–4–41(a). These requirements are not necessary for a bench warrant, the contents of which are set forth in O.C.G.A. § 17–7–90. *See Chiasson v. State*, 250 Ga. App. 63, 549 S.E.2d 503, 505 (2001) ("Requirements for bench warrants are set forth in OCGA § 17–7–90 rather than OCGA § 17–4–41."). The contents of this warrant, therefore, indicate it is a warrant for arrest rather than a bench warrant. In addition, Bunyon produced a document (Coursey Dep. at Ex. 3) that is clearly denominated a "bench warrant"; this warrant lacks the information included in the warrant used by Morgan. This bench warrant was initially intended to be issued in Bunyon's case (Doc. No. 86 at Ex. B (Hillis Aff.) ¶ 8).

The arrest warrant used by Morgan to arrest Bunyon is defective for another reason. First, the only judge involved in its issuance was Judge Hillis, who admitted that his "authority as Recorders' Court judge only allow[ed him] the authority to issue a bench [warrant] for failure to appear." (Doc. No. 86 at Ex. B (Hillis Aff.) ¶ 13.) The warrant actually issued, however, was not a bench warrant. Second, though it appears that Judge Hillis signed as a "deponent" on the warrant, the sec-

---

**12.** The Court dismissed the Burke County Sheriff's Department on June 6, 2002 because it is not a legal entity amenable to suit. (Doc. No. 31.)

tion of the warrant authorizing Bunyon's arrest was signed by Mayor Charles Whitehead. There is no dispute that Whitehead did not have the authority to issue an arrest warrant. For these reasons, the warrant is defective.

With defective process, a claim of false imprisonment is viable if the process "was secured in bad faith." *See Erfani,* 553 S.E.2d at 330. Bunyon has provided evidence that it was. First, Morgan's arrest of Bunyon was the first and only time that he had ever utilized a bench warrant to arrest someone for failure to appear. (Morgan Dep. at 51–52.) Interestingly, after Morgan arrested Bunyon, he used the occasion to question Bunyon about a series of burglaries in Midville while he had Bunyon detained. Further, after Bunyon was incarcerated, Bunyon has produced evidence that Defendants told him he could not leave the jail until he produced information about the burglaries. Based upon the foregoing, the process could have been obtained in bad faith as a means for Morgan to incarcerate Bunyon and extract information from him.

Having found that Bunyon has provided evidence that he may have been falsely imprisoned, the next question is whether official immunity shields Morgan from liability.

#### b. *Official Immunity*

Article I of the Georgia constitution protects "individual public agents from personal liability for discretionary actions taken within the scope of their official duty, and done without willfulness, malice, or corruption." *Kidd v. Coates,* 271 Ga. 33, 518 S.E.2d 124, 125 (1999) (internal quotation marks omitted). Given that Bunyon has produced evidence that Morgan acted in bad faith in procuring the warrant and intended to imprison Bunyon for the purpose of extracting information, official immunity will not protect him from liabili-

ty and summary judgment on this claim is not appropriate. Hence, Defendants' motion for summary judgment on Bunyon's claim of false imprisonment is **DENIED**.

#### c. *Whether the City of Midville May Be Liable*

While municipalities are endowed with sovereign immunity, they waive that immunity to the extent of their liability insurance. O.C.G.A. § 36–33–1; *see also Williams v. Solomon,* 242 Ga.App. 807, 531 S.E.2d 734, 736–37 (2000). The City of Midville has liability insurance. (Doc. No. 60 at 26.) The City has argued that it cannot be liable because Morgan was not acting within the scope of his employment during the arrest of Bunyon. However, I am not persuaded.

First, the arrest of Bunyon is not at issue. It is his subsequent incarceration which is at the center of Bunyon's case. In that regard, Morgan (1) was employed by the City of Midville, (2) executed a warrant issued by an official in the City of Midville in arresting Bunyon, (3) questioned Bunyon about unsolved crimes in Midville after Bunyon's arrest, and (4) transported Bunyon to Burke County after his arrest, where he was later incarcerated. These facts are sufficient to demonstrate that Morgan was acting for the City of Midville when he questioned, arrested, and later transported Bunyon to meet Burke County officials for incarceration. Thus, Defendants' motion seeking immunity for the City of Midville is **DENIED**.

### B. Punitive Damages

Defendants have asked the Court to dismiss the punitive damages claim asserted by Bunyon. (Doc. No. 53 at 24.) "Punitive damages may be awarded in a § 1983 action even without a showing of actual loss by the plaintiff if the plaintiff's constitutional rights have been violated."

*Harden v. Pataki*, 320 F.3d 1289, 1300 n. 14 (11th Cir.2003) (quoting *Dykes v.Hosemann*, 743 F.2d 1488, 1500 (11th Cir. 1984) (internal quotation marks omitted)). However, the Supreme Court has held "that a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *see also Colvin v. McDougall*, 62 F.3d 1316, 1319 (11th Cir.1995) (barring punitive damages against a sheriff in his official capacity). Furthermore, the Georgia Court of Appeals has held that a municipality, even when it has general liability insurance, may not be sued for punitive damages. *See Groves v. City of Atlanta*, 213 Ga.App. 455, 444 S.E.2d 809, 812 (1994) ("The [Georgia] Supreme Court has recently held that an award of punitive damages against a governmental entity is against public policy and is thus impermissible as a matter of law.")

■ As a result of the foregoing, Bunyon's claims for punitive damages against the City of Midville is **DISMISSED**. However, Bunyon may still seek punitive damages against any defendant in his individual capacity.

## IV. *CONCLUSION*

For reasons stated more fully above, the Midville defendants motion (Doc. No. 51) is **GRANTED IN PART** and **DENIED IN PART**. Furthermore, Bunyon's motion for partial summary judgment (Doc. No. 57) is **GRANTED IN PART** and **DENIED IN PART**. The Burke County defendants' motion will be held in abeyance until further briefing is complete.